JUSTICE SOLOMON delivered the opinion of the Court.
**260 On a night in May 2011, an off-duty Newark police officer was shot and killed in a restaurant while waiting to purchase a slice of pizza for his dinner. Defendant Rasul McNeil-Thomas was convicted by a jury of shooting the officer, among other crimes. In this appeal, we consider the Appellate Division's reversal of defendant's convictions upon its findings that a brief segment of video **261 surveillance played during summation was not admitted into evidence at trial and that, during summation, the prosecutor improperly linked defendant to one of the vehicles shown in the video segment.
First, we disagree that the video was not admitted into evidence. We defer to the trial judge's determination that the disputed footage was played for the jury during the State's case-in-chief. And although defense counsel preserved an objection to the admission of extraneous surveillance footage, a careful review of the trial transcript shows that defense counsel consented to the admission of the surveillance footage depicting the moments surrounding the shooting, including the video segment at issue. We therefore find the court did not abuse its discretion in permitting the prosecutor to play the video segment during his closing remarks.
Next, we consider whether it was proper for the prosecutor to invite the jury to infer that the video segment showed defendant in one of the vehicles, following his stepfather in another, driving by the restaurant shortly before the shooting. We conclude that the prosecutor's comments were reasonable and fair inferences supported by the evidence presented at trial.
*848 We therefore reverse the judgment of the Appellate Division, reinstate defendant's convictions, and remand for consideration of defendant's sentencing arguments.
I.
A.
The trial transcript reveals that on a night in May 2011, William Johnson, an off-duty Newark police officer, waited for a slice of pizza at the Texas Fried Chicken and Pizza Restaurant, known as the "chicken shack." The restaurant was located at the intersection of Lyons Avenue and Clinton Place in Newark. As Officer Johnson waited at the restaurant along with several others -- including a five-month-old baby -- a silver Chevrolet Malibu slowly **262 passed the chicken shack, as captured by the restaurant's exterior surveillance camera.
The video showed a distinct muzzle flash emanating from the front passenger window of the car as several rounds were fired into the restaurant. One of those bullets struck Officer Johnson in the chest, killing him. Three other patrons were wounded. The silver Malibu sped off, turning left on Lyons Avenue.
Surveillance video obtained from the nearby Bobby's Restaurant showed the silver Malibu turn off of Lyons Avenue, headed in the direction of where it was later found abandoned -- four blocks from the scene of the shooting and around the corner from defendant's residence. Among other items of evidential value, police recovered five spent shell casings from inside the silver Malibu and three shell casings from outside the restaurant. Ballistics analysis later established that the same nine-millimeter handgun fired three of the five shell casings found inside the car and the three shell casings recovered from outside of the restaurant.
Surveillance video obtained from St. Peter's Park, located between where the Malibu was abandoned and defendant's residence, showed two black males wearing hoodies walking through the park toward defendant's residence immediately after the shooting. A K-9 unit later tracked a scent from the driver's seat of the Malibu through the park and directly past the front of defendant's house before losing the scent near his home.
Witnesses also linked defendant to the Malibu, which had been carjacked from the driveway of a home located on Clinton Place, only a block-and-a-half away from the restaurant.
First, the carjacking victim described how she was sitting in the front passenger seat of her boyfriend's idling silver Malibu when a man who was wearing "some type of sweater or something" ordered her out of the car by tapping his gun on the driver's side window. As she exited the car, she saw a second man standing about a foot-and-a-half away from her wearing a hoodie; she could see the outline of a gun in his hoodie. By the time she reached the **263 steps of her boyfriend's home, she heard the car speeding out of the driveway. Seconds later, she heard the sound of gunshots coming from the chicken shack down the block. She was shown a photo array about seven hours after the incident but was unable to make an identification. Later that afternoon, police showed her the same photo lineup, and the carjacking victim identified defendant as the man wearing a hoodie.
Two witnesses who were at the murder scene also identified defendant. The first witness, who was standing directly outside of the chicken shack as the shots were fired from the Malibu, identified defendant as one of the shooters from a photo array *849 about three months after the murder. At trial, she explained to the jury that initially she did not want to get involved with the investigation because she was too scared to come forward. It was also revealed on direct examination that she used one "deck"[1] of heroin at noon on the day of the murder, but she testified that she was not under the influence at the time of the shooting, more than nine hours later.
The second witness, who knew defendant and his family, was standing in the front doorway of the restaurant and facing the street as the Malibu approached. She told investigators in a videotaped statement just hours after the incident that she "locked eyes" with one of the shooters, whom she identified as defendant. She also identified defendant through a photo array later that same night. At trial, however, the witness recanted while on the stand. A Gross [2] hearing was held, during which the State called the two investigators who conducted the videotaped interview of the witness on the night of the murder. The court found that the witness "told the truth at the time" she provided her videotaped **264 statement, which was then admitted into evidence and played for the jury.
Investigating officers learned that, about an hour before the shooting, a street brawl took place in front of defendant's home between defendant and his family and a group of young women, including three later seen in the restaurant at the time of the shooting. According to the State, defendant's motive for the shooting was retribution for that earlier assault against defendant and his family.
Defendant's neighbor, who called 9-1-1 to report the street brawl, told police she saw defendant and his stepfather leave defendant's home together in a blue pickup truck shortly after the fight was over. According to the neighbor, she then saw both men return home, but defendant was in a black sedan -- which she described as "like" a Cadillac CTS -- with three other individuals, while the stepfather returned alone in the blue pickup truck. The neighbor also stated that, after a brief discussion outside of defendant's residence, defendant and one of the others got back into the black sedan and drove off, following the stepfather in the blue pickup truck. As part of their investigation, the police obtained a search warrant and seized, processed, and photographed a blue 1993 Ford pickup truck belonging to defendant's stepfather, with custom chrome fender flares and a damaged rear bumper.
Significantly, the police also discovered that surveillance video from the scene had captured a pickup truck pass the restaurant shortly before the shooting, followed by a black sedan. Investigators developed the theory that defendant and his stepfather had driven by the chicken shack in search of the young women from the brawl and that, finding them there, defendant carjacked the Malibu and returned to shoot them.
B.
Defendant was arrested the day after the shooting for carjacking the silver Malibu. He was later indicted for the murder of Officer Johnson, several attempted murders and aggravated assaults **265 of other individuals, the carjacking, and other related conspiracy and weapons offenses. *850 A month-long trial followed, during which evidence offered by the State included the video surveillance footage from the restaurant's security cameras and digital stills created from the video footage, video surveillance footage from two nearby establishments, the testimony of defendant's neighbor who called 9-1-1, and the photos of the blue pickup truck processed by police.
Defendant's neighbor confirmed during her testimony that the pickup truck depicted in the police photos was the same truck she saw leaving defendant's home followed by the black sedan shortly before the shooting. On cross-examination, defense counsel vigorously challenged the neighbor's recollection of the vehicular traffic in front of her home that evening. Specifically, he questioned her extensively on the order in which the pickup truck and the sedan left the home, as well as her ability to recall who was in the black sedan.
The State also offered into evidence defendant's sworn statement taken by police after his arrest. Although he could not recall the exact time, defendant stated that he and his stepfather left the house together and traveled down Lyons Avenue in a dark green or dark blue Ford pickup truck around the time of the shooting to "look for music."[3] The route defendant described would have taken them past the chicken shack.
After the State called the owner of the chicken shack as its first witness to authenticate the restaurant's surveillance footage, defense counsel requested a sidebar, during which he stated that he "definitely [didn't] have any objections ... to any of the portions they are going to play," but recognized that "the video itself contains a lot of material." Defense counsel stated that he **266 "want[ed] to reserve, just for later" an objection to irrelevant footage "from like an hour before." The court interpreted defense counsel's request as an objection to "[d]owntime" and "extraneous stuff," but warned that once the video is played for the jury "[y]ou can't unring the bell." Defense counsel acknowledged that "everything played before the jury in the courtroom is in evidence, but we can talk about the scope later." The court admitted the restaurant's surveillance camera footage in its entirety into evidence "subject to sidebar."
Later, while the lead detective assigned to the investigation was on the witness stand, the State played the footage captured by the restaurant's exterior security camera beginning forty-six seconds before a pickup truck followed by a sedan came into view. While the video played, the detective explained to the jury how it showed cars traveling on "Clinton Place north," intersecting with Lyons Avenue going "east and west," and that he "spent a significant amount of time trying to figure out about the cars that were coming in and out of this location." Seventy-six seconds after that video segment started, the State fast forwarded to about a minute before the shooting.[4] Notably, defense counsel did *851 not object when the State played the videotape showing vehicular traffic, including a pickup truck followed by a sedan, passing by the restaurant about four minutes before the shooting.
C.
During defense counsel's summation, he reminded the jury of the neighbor's testimony that the stepfather left first in the pickup **267 truck, while defendant followed in a black Cadillac. He also asked the jury to discredit her testimony because "she [didn't] see all the people who got out of the black car."
During the State's closing argument, the prosecutor played the video footage captured by the chicken shack's exterior surveillance camera, along with videotape from two nearby businesses: Bobby's Restaurant and the Oasis Bar.[5] The State first played the chicken shack video, which showed cars driving through the intersection of Lyons Avenue and Clinton Place. The prosecutor paused the tape when a pickup truck entered the video frame. He then showed the photos depicting the blue pickup truck processed by the police next to the image of the pickup truck on the paused videotape so the jury could compare the two. He asked the jurors:
What do you see? You could see a blue pickup truck. You could see a blue pickup truck. You could see the same headlights. You could see the same headlights. You can't see the license plate, but if you look in the light, you know what you can see? You can see the defect in the bumper. There's a defect in the bumper. The bumper had been hit. The bumper had been hit and you can see the car eerily creeping up Clinton Place going northbound right by the chicken shack, about three minutes and 46 seconds before the bullets were fired.
The prosecutor then resumed playing the chicken shack video, and a sedan entered the frame, following the pickup truck. The prosecutor asked the jury to infer that the sedan shown in the video was the sedan described by the concerned neighbor as "like" a black Cadillac CTS, stating, "Cadillac CTS. Cadillac CTS, black Cadillac CTS." He also asserted that the pickup truck shown in the video traveling in front of the sedan was the same blue, eighteen-year-old truck that the neighbor testified she saw defendant's stepfather driving on the night of the shooting -- with the custom chrome fender flares and the distinctive damaged rear bumper, as depicted in the police evidence photos.
Next, to show the jury the direction the two vehicles were heading after they passed the chicken shack, the prosecutor **268 played a brief excerpt of videotape obtained from Bobby's, which was located one block west of the chicken shack, on the same side of Lyons Avenue.[6] The prosecutor paused the Bobby's tape as both vehicles entered the frame, urging the jury to "[t]ake a look. Pickup truck. Cadillac CTS." After reminding the jurors that both vehicles would have passed the idling Malibu as they traveled northbound on Clinton Place before reaching the chicken shack, the prosecutor resumed playing the Bobby's tape. The video showed the sedan suddenly turning left while the pickup *852 truck continued straight on Lyons Avenue. The prosecutor urged the jury to consider the significance of the sedan's turn, arguing that "as soon as the Cadillac makes a left turn ... you know what, he's one block away from [the carjacking victim] sitting in that Malibu."
The prosecutor then played a short clip of footage from the Oasis Bar's exterior surveillance camera, which showed only a black sedan traveling down Aldine Street -- the street that the black sedan suddenly turned onto after it stopped following the blue pickup truck. Once again he argued to the jury that the black sedan shown in the Oasis Bar's video was the same Cadillac CTS that was the subject of the neighbor's testimony.
Following summations, defense counsel made a motion for a mistrial claiming the prosecutor "played a piece of tape" not entered into evidence and "testified" about it. The trial judge denied the motion, finding the footage was admitted into evidence and the prosecutor's remarks were fair comment on the evidence. The court accordingly refused to give a curative instruction on the prosecutor's comments about the vehicles and their association with defendant.[7]
**269 During deliberations, the jury sent a note stating, "We would like to see; the tape before the shooting which shows the blue truck and the black car. It was only shown by the prosecutor at the closing statement. Can/may we see this again? Can it count as evidence?" Over defense counsel's objection, the judge determined that, since both the chicken shack and Bobby's videos showing "the blue truck and the black car" were in evidence, they could be viewed again and considered by the jury. Both videos were then played for the jury in open court.
D.
The jury acquitted defendant of first-degree murder but found him guilty of the lesser-included offense of first-degree aggravated manslaughter for the death of Officer Johnson. The jury also found defendant guilty of conspiracy to commit carjacking, carjacking, conspiracy to commit murder, the attempted murder and aggravated assault of some of the other restaurant patrons who were injured, and various other weapons-related offenses. Defendant was sentenced to serve two consecutive terms of thirty years of imprisonment, with a period of parole ineligibility of eighty-five percent under the No Early Release Act, N.J.S.A. 2C:43-7.2.
The Appellate Division reversed defendant's convictions and remanded for a new trial, finding that videotape segments the prosecutor played during his closing remarks -- the chicken shack, Bobby's, and the Oasis Bar's footage -- were not admitted into evidence. According to the appellate court, that alleged error, coupled with the prosecutor's improper comments linking defendant to the vehicles shown in those video segments, was so egregious that defendant was deprived of a fair trial. In light of that holding, the Appellate Division did not consider sentencing arguments raised by defendant.
**270 We granted the State's petition for certification. 234 N.J. 200, 189 A.3d 902 (2018). We also granted amicus curiae status *853 to the Attorney General of New Jersey.
II.
Defense counsel's mistrial motion raised only whether the five-second segment of the chicken shack video showing a pickup truck followed by a sedan was admitted into evidence and played for the jury during the State's case-in-chief and so, in this appeal, the parties' contentions focus only on that particular segment of video.
The State maintains that the five-second segment of videotape that shows a pickup truck followed by a sedan as both vehicles passed the chicken shack approximately four minutes before the shooting was entered into evidence and played for the jury during the testimony of the lead investigator. In the State's view, the Appellate Division failed to afford proper deference to the trial court's finding that the disputed footage was admitted.
Moreover, the State contends that, based on the totality of the evidence presented at trial, it was reasonable for the prosecutor to invite the jury to infer that the two vehicles shown in the surveillance footage were the same two vehicles that the concerned neighbor saw leaving defendant's residence after the brawl but before the shooting. Finally, the State argues that its proofs were overwhelming and that the evidence in question, if admitted in error, was incapable of causing an unjust result.
The Attorney General adds that the Appellate Division should have deferred to the trial judge's determination that the video segment was in evidence, rather than jettisoning the appropriate standard of review to make its own factual findings. According to the Attorney General, any alleged error by the prosecutor during his summation was harmless, especially in light of the substantial evidence of defendant's guilt.
In response, defendant asserts that the five-second segment of surveillance video played by the State during its closing was **271 admitted "subject to sidebar" but never played for the jury at trial, and thus never admitted into evidence. Relying on the question the jury sent to the court during deliberations, defendant maintains that there is no way to be certain that the clip was ever played for the jury because the State failed to specifically ask the lead investigator on direct examination whether the pickup truck in the video was defendant's stepfather's truck. Furthermore, even if the video was admitted into evidence, defendant contends that it was improper for the prosecutor to argue that defendant was in the black sedan shown in the video because the only witness who testified to seeing him enter that vehicle was never shown the videotape. According to defendant, the prosecutor's actions denied him a meaningful opportunity to present a complete defense in violation of both the Federal and State Constitutions.
III.
We begin our analysis by addressing defendant's contention that the five-second video segment obtained from the chicken shack's exterior surveillance camera was never admitted into evidence.
A.
At the outset, we acknowledge "[t]he traditional deference given to factual findings of the trial court" and its "deep roots in our jurisprudence." State v. S.S., 229 N.J. 360, 374, 162 A.3d 1058 (2017). Appellate courts "have long deferred to trial courts' factual determinations because they 'hear and see the witnesses and ... have the "feel" of the case, which a reviewing court cannot enjoy.' " State v. S.N., 231 N.J. 497, 513, 176 A.3d 813 (2018) (quoting State v. Johnson, 42 N.J. 146, 161, 199 A.2d 809 (1964) ). Further, that deferential standard of review applies "regardless of *854 whether the evidence is live testimony, a videotaped statement, or documentary evidence." Id. at 514, 176 A.3d 813 ; see S.S., 229 N.J. at 379, 162 A.3d 1058 ("[A] standard of deference to a trial court's factfindings, even factfindings based solely on video or documentary evidence, best advances the interests of justice in a judicial **272 system that assigns different roles to trial courts and appellate courts.").
We have repeatedly emphasized that, when reviewing the findings of a trial court, "the customary role of an appellate court is not to make factual findings but rather to decide whether those made by the trial court are supported by sufficient credible evidence in the record." S.S., 229 N.J. at 365, 162 A.3d 1058 ; see State v. Nantambu, 221 N.J. 390, 402-03, 113 A.3d 1186 (2015) ("[W]e uphold the facts found by the ... judge to the extent they are supported by sufficient credible evidence in the record ...."). Limiting the role of a reviewing court is necessary because "[p]ermitting appellate courts to substitute their factual findings for equally plausible trial court findings is likely to 'undermine the legitimacy of the [trial] courts in the eyes of litigants.' " S.S., 229 N.J. at 380-81, 162 A.3d 1058 (second alteration in original) (quoting Fed. R. Civ. P. 52(a) advisory committee's note to 1985 amendment). As a result, the trial court's factual determination in this case that the video segment at issue was played to the jury during the State's case-in-chief is "subject to limited appellate scrutiny, as [it is] reviewed under the abuse of discretion standard." State v. Buda, 195 N.J. 278, 294, 949 A.2d 761 (2008) (citing Hisenaj v. Kuehner, 194 N.J. 6, 12, 942 A.2d 769 (2008) ).
A careful review of the trial transcript reveals that the court admitted the chicken shack's surveillance video in its entirety "subject to sidebar." At sidebar, defense counsel preserved an objection to the admission of extraneous footage "from like an hour before." Indeed, counsel acknowledged that "[t]he video itself contains a lot of material," but then noted, "we can talk about the scope later" if necessary. Yet the videotape was the subject of extensive testimony and cross-examination, and its scope went unchallenged by defense counsel while it was played for the jury. If counsel considered the vehicular traffic driving by the restaurant four minutes before the shooting to be irrelevant and prejudicial, we presume he would have objected, as he did when the State played other segments of the videotape depicting events minutes **273 after the shooting.[8] In short, counsel's preserved objection had nothing to do with whether the disputed five-second segment was ever played for the jury. Defense counsel objected only to irrelevant footage "from like an hour before," and consented to the admission of the surveillance footage depicting the moments surrounding the shooting.
The judge who presided over this month-long trial during which he "hear[d] and [saw] the witnesses," S.N., 231 N.J. at 513, 176 A.3d 813 (quoting Johnson, 42 N.J. at 161, 199 A.2d 809 ), made a factual determination that the disputed five-second segment of tape showing both vehicles passing by the restaurant was played by the State during its case-in-chief. Indeed, the timestamped version of the lead detective's testimony supports the trial court's decision, as does the detective's explanation to the jury while the video played of how he "spent a significant amount of time trying to figure out about the cars that were coming in and out of this location."
*855 That the prosecutor did not ask the detective to identify the pickup truck shown on the video is immaterial and has no relevance to whether the disputed five-second video segment was played for the jury during the State's case-in-chief.
Finally, defendant's reliance on the jury's note to support his claim that the disputed video segment was never played during trial is unpersuasive and an improper invitation to "engage in speculation about a jury's deliberative thought process." State v. Wilder, 193 N.J. 398, 416, 939 A.2d 781 (2008). In declining that invitation, we recognize "the reality that jurors cannot be expected to have perfect recall of every bit of evidence introduced during a trial." State v. Miller, 205 N.J. 109, 120, 13 A.3d 873 (2011).
In light of the discretion afforded trial court evidentiary rulings, see Buda, 195 N.J. at 294, 949 A.2d 761, and in keeping with our deeply-rooted tradition of deference to a trial court's factual **274 findings, S.S., 229 N.J. at 374, 162 A.3d 1058, we conclude there was sufficient, credible evidence in the record for the trial court here to determine that the disputed five-second snippet of tape was played for the jury and entered into evidence.
Accordingly, we find that the court did not abuse its discretion in permitting the prosecutor to play the chicken shack video segment during his closing remarks. In doing so, we also recognize that the video clip from Bobby's, which was played for the jury during the lead detective's testimony without objection, showed a sedan following a pickup truck traveling down Lyons Avenue, only seconds after the two vehicles would have passed the chicken shack. Hence, the Appellate Division's initial premise relied upon in reversing defendant's conviction -- that the videotape segments the prosecutor played during his closing remarks were not admitted into evidence -- is erroneous.
IV.
Having established that the trial court did not abuse its discretion in allowing the State to play the disputed videotape during its summation, we now determine whether it was proper for the prosecutor to invite the jury to infer that the five-second segment showed defendant in a black sedan following his stepfather's pickup truck driving by the restaurant shortly before the shooting.
A.
This Court recognizes "[t]he seminal role prosecutors play" in our criminal justice system. State v. Mahoney, 188 N.J. 359, 376, 908 A.2d 162 (2006) ; see State v. Smith, 212 N.J. 365, 402, 54 A.3d 772 (2012) ("New Jersey courts have commented repeatedly on the special role filled by those entrusted with the responsibility to represent the State in criminal matters ...."). We have described that role as "uniquely challenging" because it is a "double calling -- to represent vigorously the state's interest in law enforcement and at the same time help assure that the accused is treated fairly and that justice is done."
**275 Mahoney, 188 N.J. at 376, 908 A.2d 162 (quoting State v. Ramseur, 106 N.J. 123, 323-24, 524 A.2d 188 (1987) ). "Consistent with their obligation to seek justice, prosecutors may not advance improper arguments." State v. Lazo, 209 N.J. 9, 29, 34 A.3d 1233 (2012). "It is as much [the prosecutor's] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." State v. Frost, 158 N.J. 76, 83, 727 A.2d 1 (1999) (quoting State v. Farrell, 61 N.J. 99, 105, 293 A.2d 176 (1972) ).
*856 Nevertheless, "prosecutors in criminal cases are expected to make vigorous and forceful closing arguments to juries" and are therefore "afforded considerable leeway in closing arguments as long as their comments are reasonably related to the scope of the evidence presented." Id. at 82, 727 A.2d 1. In other words, as long as the prosecutor "stays within the evidence and the legitimate inferences therefrom," State v. R.B., 183 N.J. 308, 330, 873 A.2d 511 (2005) (quoting State v. Mayberry, 52 N.J. 413, 437, 245 A.2d 481 (1968) ), "[t]here is no error," State v. Carter, 91 N.J. 86, 125, 449 A.2d 1280 (1982). "Ultimately it [is] for the jury to decide whether to draw the inferences the prosecutor urged." Carter, 91 N.J. at 125, 449 A.2d 1280.
Furthermore, even when a prosecutor's remarks stray over the line of permissible commentary, our inquiry does not end. Rather, we weigh "the severity of the misconduct and its prejudicial effect on the defendant's right to a fair trial," and we reverse a conviction on the basis of prosecutorial misconduct only if "the conduct was so egregious as to deprive defendant of a fair trial." State v. Wakefield, 190 N.J. 397, 437, 921 A.2d 954 (2007) (quoting State v. Papasavvas, 163 N.J. 565, 625, 751 A.2d 40 (2000) ); see State v. Jackson, 211 N.J. 394, 408-09, 48 A.3d 1059 (2012) (" '[N]ot every deviation from the legal prescriptions governing prosecutorial conduct' requires reversal." (quoting State v. Williams, 113 N.J. 393, 452, 550 A.2d 1172 (1988) )).
**276 "Prosecutorial comments are deemed to have violated the defendant's right to a fair trial when they 'so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process.' " Jackson, 211 N.J. at 409, 48 A.3d 1059 (alteration in original) (quoting State v. Koedatich, 112 N.J. 225, 338, 548 A.2d 939 (1988) ). Notably, a determination as to whether a prosecutor's comments had the capacity to deprive defendant of a fair trial must be made "within the context of the trial as a whole." State v. Feaster, 156 N.J. 1, 64, 716 A.2d 395 (1998) (citing Ramseur, 106 N.J. at 323, 524 A.2d 188 ); accord State v. Johnson, 31 N.J. 489, 513, 158 A.2d 11 (1960) ("Particular remarks must be appraised in the setting of the whole trial.").
To warrant the remedy of a new trial, there must have been "some degree of possibility that [the prosecutor's comments] led to an unjust result." R.B., 183 N.J. at 330, 873 A.2d 511 (quoting State v. Bankston, 63 N.J. 263, 273, 307 A.2d 65 (1973) ). And that "possibility must be real, one sufficient to raise a reasonable doubt as to whether [it] led the jury to a verdict it otherwise might not have reached." Ibid. (alteration in original) (quoting Bankston, 63 N.J. at 273, 307 A.2d 65 ).
B.
Because the prosecutor's alleged improprieties here involve comments made about the sedan following the pickup truck shown on the videotape driving by the restaurant about four minutes before the shooting, we must first set forth in some detail the State's proofs about those two vehicles -- along with defense counsel's response -- before we address the inferences the State invited the jury to draw.
The video surveillance tape obtained from the restaurant's exterior camera showed a sedan following a pickup truck driving past the restaurant about four minutes before the shooting. The State entered eight photographs of the stepfather's blue Ford pickup truck into evidence through the testimony of defendant's across-the-street neighbor. Those photos, taken by police as part **277 of processing the *857 vehicle, depicted distinctive custom chrome fender flares over each of the four tires, as well as noticeable damage to the passenger-side rear bumper. The State also entered into evidence two digital stills from the chicken shack's surveillance video showing a pickup truck as it drove by the restaurant.
The neighbor stated that she had observed defendant and his stepfather leave their home together in a blue pickup truck. During direct examination, when shown the photos of the blue pickup truck that the police processed, the neighbor confirmed that the truck in those photos was the same truck she saw defendant and his stepfather drive away in on the night of the shooting.
That testimony was supported by defendant's own statement that, although he could not recall the exact time, he and his stepfather left the house together and traveled down Lyons Avenue in a dark green or dark blue Ford pickup truck around the time of the shooting to "look for music." The route defendant described to the police would have taken them past the chicken shack before the shooting.
When the pair returned home, the neighbor noticed that the stepfather was alone in the pickup truck, while defendant came back in "another car" with three other individuals. When asked to describe the other car defendant was in, the neighbor said it looked "like a Cadillac." She characterized it as one of "the newer ones." Not one of the "boxier" older models, but a black, four-door sedan with a "round" body -- what she perceived to be a Cadillac CTS. She then explained that shortly before the shooting, defendant and one of the other individuals got back into the black sedan and drove off, following the stepfather in the blue pickup truck.
On cross-examination, defense counsel vigorously challenged the neighbor's recollection of the vehicular traffic in front of her home that evening. Specifically, he questioned her extensively on the order in which the pickup truck and the sedan left the home, as well as her ability to recall who was in the black sedan. Later, during his summation, defense counsel himself reminded the jury **278 of the neighbor's testimony that the stepfather left first in the pickup truck while defendant followed in a black Cadillac.[9] He asked the jury to discredit her testimony because "she [didn't] see all the people who got out of the black car," not because of her description of the vehicles.
C.
In light of the evidence presented at trial, as well as defense counsel's cross-examination of the concerned neighbor and his arguments at closing about the neighbor's testimony, we now analyze the specific comments made by the State in its *858 summation, mindful of the unique role that prosecutors play in our criminal justice system -- "to represent vigorously the state's interest in law enforcement and at the same time help assure that the accused is treated fairly and that justice is done." Mahoney, 188 N.J. at 376, 908 A.2d 162 (quoting Ramseur, 106 N.J. at 323-24, 524 A.2d 188 ).
Defendant asserts that the State unfairly surprised the defense by associating defendant with the black sedan following the pickup truck as it passed the chicken shack about four minutes before the **279 shooting. Specifically, defendant suggests that his surprise denied him a meaningful opportunity to present a complete defense. He makes this assertion notwithstanding defense counsel's vigorous cross-examination of the neighbor about her memory of the order of the vehicles as they pulled away from defendant's home, and his plea during closing that the jury disregard the neighbor's testimony about defendant being inside the black sedan.
Clearly, defense counsel was aware of the video segment and its import. While the prosecution is obliged "to refrain from improper methods calculated to produce a wrongful conviction," Frost, 158 N.J. at 83, 727 A.2d 1 (quoting Farrell, 61 N.J. at 105, 293 A.2d 176 ), the State is under no duty to announce to the defense each inference it will ask the jury to reach during summation. In this case, the inferences suggested by the prosecutor were ones that defense counsel's conduct at trial shows he was aware of and anticipated.
By his closing, the prosecutor here marshalled the police photos of the stepfather's pickup truck, the video surveillance footage, the neighbor's testimony about the black sedan, and defendant's own sworn statement -- that he traveled down Lyons Avenue with his stepfather in a dark green or dark blue Ford pickup truck around the time of the shooting -- to provide context to the jury. In doing so, he suggested that defendant was "eerily creeping" by the chicken shack about four minutes before the shooting to verify that the young women who assaulted his family were at the restaurant. After asking the jury to compare the paused videotaped image of the pickup truck with the truck depicted in the police photos, the prosecutor then pressed play; as the black sedan entered the frame, he stated, "Cadillac CTS, black Cadillac CTS."
However, unlike the prosecutor in Feaster who had no evidential support for his assertion, 156 N.J. at 56, 716 A.2d 395, the prosecutor here invited jurors to adopt "inferences" about both vehicles "that [they] could draw from proven facts," Carter, 91 N.J. at 125, 449 A.2d 1280 -- the photos, the video footage, and the neighbor's testimony. The prosecutor here permissibly sought to **280 connect interrelated pieces; he did not improperly seek "to provide some of the missing pieces." See Feaster, 156 N.J. at 56, 716 A.2d 395. The jury was given the opportunity to simultaneously compare the truck on the videotape with the police photos showing its distinct features (the chrome fender flares and the damaged rear bumper), all of which were properly admitted into evidence. In light of the neighbor's confirmation that the pickup truck she saw coming and going that evening was the same vehicle as shown in the police photos, we find it was reasonable for the prosecutor to invite the jury to infer that the pickup truck shown on the videotape was the stepfather's blue 1993 Ford pickup truck.
Additionally, given the neighbor's testimony, we find that the prosecutor's identification of the sedan as the Cadillac CTS described by the neighbor was fair comment on the evidence and a legitimate inference "based on sharply disputed facts *859 in the record." Lazo, 209 N.J. at 29, 34 A.3d 1233. Indeed, defense counsel's forceful cross-examination challenging the neighbor's recollection of the order in which the pickup truck and the sedan left the home, as well as who was in the sedan, establishes that the facts surrounding the vehicular traffic in front of defendant's home prior to the shooting were contested by both parties. Unlike in Feaster, where we determined the prosecutor's comments were highly improper because he strayed beyond the evidence by suggesting in summation that the defendant had loaded a gun during a car ride with "no basis [for that comment] in the record," 156 N.J. at 62, 716 A.2d 395, here the prosecutor did not deviate from the "evidence revealed during the trial" at any point during his summation, see Mahoney, 188 N.J. at 376, 908 A.2d 162 (quoting State v. Smith, 167 N.J. 158, 178, 770 A.2d 255 (2001) ).
In sum, the prosecutor's argument that the videotape showed a Cadillac CTS following the stepfather's pickup truck shortly before the shooting was "reasonably related to the scope of the evidence presented," Frost, 158 N.J. at 82, 727 A.2d 1, and fell squarely "within the considerable leeway afforded [to prosecutors] in closing argument," Lazo, 209 N.J. at 29, 34 A.3d 1233 (internal **281 quotation omitted). Thus, we find that the prosecutor's comments during his summation regarding the two vehicles shown in the videotape were reasonable and fair inferences supported by the evidence at trial and fell within "the boundaries of permissibly forceful advocacy." State v. Marshall, 123 N.J. 1, 161, 586 A.2d 85 (1991).
V.
For the reasons set forth above, we reverse the judgment of the Appellate Division, reinstate defendant's convictions, and remand for consideration of defendant's sentencing arguments.
JUSTICES PATTERSON, FERNANDEZ-VINA, and TIMPONE join in JUSTICE SOLOMON'S opinion. JUSTICE LaVECCHIA filed a dissenting opinion, in which CHIEF JUSTICE RABNER and JUSTICE ALBIN join.

"Decks" of heroin refer to the "little glassine packets" that contain "the powdery substance." State v. Morrison, 188 N.J. 2, 5, 902 A.2d 860 (2006) ; see State v. Gonzales, 227 N.J. 77, 86 n.4, 148 A.3d 407 (2016) ("Each glassine envelope is known as a deck.").

State v. Gross, 216 N.J. Super. 98, 523 A.2d 215 (App. Div. 1987).

Defendant estimated that he and his stepfather left sometime between 9:00 p.m. and 9:30 p.m. and were gone for about four minutes. Investigators were able to identify that the shots were fired into the chicken shack at exactly 9:49 p.m. by utilizing "ShotSpotter" technology.

In response to defendant's claim that the disputed five seconds of tape were never played for the jury prior to summations, the State submitted a timestamped version of the lead detective's testimony. That transcript reveals that the State began playing the video "that shows the cars" at 11:59:54 a.m. At 12:01:10 p.m. -- seventy-six seconds after the tape was started -- the State stopped the video. According to the State, the disputed five-second segment showing both vehicles driving by the restaurant was included within that seventy-six-second segment of video played by the State during the detective's testimony.

At trial, the State called the owners of both of those establishments to authenticate the surveillance camera footage before moving it into evidence.

It is undisputed that the Bobby's surveillance camera footage was admitted into evidence and played by the State, without objection, during the testimony of both the restaurant's owner and the lead investigator.

The judge gave a standard jury charge, which included the following: "Arguments, statements, remarks, openings and summations of counsel are not evidence and must not be treated as evidence. Although the attorneys may point out what they think is important in this case, you must rely solely upon your understanding during the trial."

For example, defense counsel promptly objected to the specific portion of tape that showed Officer Johnson lying on the floor of the restaurant in a pool of blood as highly prejudicial under N.J.R.E. 403.

During his summation, defense counsel correctly summarized the neighbor's testimony, which was as follows:
Q: What did you say about the Cadillac, ma'am?
A: That they all -- they got back into the Cadillac, or the Caddy, and drove off. And I said, I say black Caddy because that's what it looked like to me.
Q: Who was driving that black Caddy?
A: I'm not really sure.
Q: How many people were in that Cadillac?
A: Four.
Q: And when that left, was the defendant in that Cadillac?
A: Yes.
Q: And when it left, did it leave with any other cars?
A: Yes.
Q: What car did it leave with?
A: They followed -- the father left and then the car left.
Q: When you say, "the father left," what car was the father driving?
A: The pickup truck.