NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-4156-19

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

RAKIM P. WILLIAMS a/k/a
PRINCE WILLIAMS,

      Defendant-Appellant.

APPROVED FOR PUBLICATION

March 3, 2022

APPELLATE DIVISION

Argued February 7, 2022 – Decided March 3, 2022

Before Judges Accurso, Rose and Enright.

On appeal from the Superior Court of New Jersey, Law Division, Mercer County, Indictment Nos. 17-12-0602 and 18-08-0471.

James K. Smith, Jr., Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; James K. Smith, Jr., of counsel and on the briefs).

Matthew S. Samel, Assistant Prosecutor, argued the cause for respondent (Angelo J. Onofri, Mercer County Prosecutor, attorney; Matthew S. Samel, of counsel and on the brief).

The opinion of the court was delivered by

ROSE, J.A.D.

A jury convicted defendant Rakim P. Williams of second-degree possession of a weapon by a convicted felon. To piece together the events as they occurred on the night defendant was arrested, the State presented the testimony of several law enforcement officers and introduced in evidence surveillance video from a nearby laundromat. Defendant testified and called two witnesses in his defense. But he contends his conviction turned on the evidence the State did not reveal to the jury until both sides had rested.

At issue is the propriety of the prosecutor's closing comments on a seven-minute segment of surveillance footage, included as part of the one-hour video recording admitted in evidence but not played for the jury by either side during trial. Although the trial court denied the prosecutor's request to play the previously unseen segment on summation, the court afforded the jurors the option of viewing this footage during their deliberations.

Upon the jury's ensuing request, the seven-minute segment was played for the first time in open court. Because defendant was not afforded an opportunity to address the footage, we conclude the prosecutor's remarks exceeded the bounds of proper conduct and the court's evidentiary decision compounded the error, thereby denying defendant a fair trial. Accordingly, we vacate defendant's conviction and remand for a new trial.

A-4156-19

## I.

Around 9:10 p.m. on September 15, 2017, several members of the Trenton Police Department's Street Crimes Unit were proactively patrolling the area of East State Street and North Olden Avenue in a three-car police caravan. Detective Erik Mancheno testified he saw defendant emerge from the alleyway between two abandoned houses located on East State Street. Upon illuminating defendant with his flashlight, Mancheno observed defendant remove a black object from his waistband and toss it to the ground. Defendant ignored Mancheno's orders to stop, ran down the alleyway and through a yard, climbed a barbed-wire fence, and eventually was arrested by another officer. Returning to the location where he saw defendant drop the object, Mancheno recovered a loaded nine-millimeter handgun wrapped inside a black ski mask.

Portions of defendant's encounter with the detectives were captured on a nearby laundromat's surveillance cameras. Prior to trial, the defense obtained the video recording, which was provided to the State at defendant's detention hearing. During Mancheno's trial testimony, the State moved into evidence the disc containing the video recording in its entirety. After confirming the recording would be played for the jury, defense counsel posed no objection to the prosecutor's application, and the disc containing the entire recording was admitted in evidence without redactions. Anticipating the State would play the

entire video, the court gave the jury a short recess. After the break, the prosecutor indicated he intended to play only "certain spots" of the recording.

Mancheno's direct examination continued with his narration of select segments of the video. The prosecutor briefly played the beginning of the first clip, which began at 9:00 p.m. This footage depicted 1160 and 1162 East State Street and an angled view of the alleyway between the two buildings. Mancheno noted the buildings were blocked by a tree. He confirmed the footage did not enable the viewer to "see into the alley."

The prosecutor fast forwarded past the next seven minutes of the recording to the events that occurred at 9:07 p.m. Mancheno noted a "blurry object . . . walking on the sidewalk towards the alleyway." The video then depicted police cars driving by the scene, and Mancheno exiting his vehicle and entering the alleyway. A clearer angle showed a detective arresting defendant.

The State called several other members of the Street Crimes Unit, who testified to their involvement in the incident. The State also presented the testimony of three expert witnesses, two of whom confirmed the results of their forensic examination did not reveal defendant's DNA or fingerprints on the handgun.

A-4156-19

Defendant testified and disavowed possession, or any knowledge, of the handgun recovered by police. He explained why he was at the scene, located "[r]ight down the street" from his home. After defendant and his wife ran errands together, she drove him to East State Street around 9:00 p.m. and returned home so she could get ready for their anniversary celebration. Defendant met with about eight people. They were sitting on the steps of 1162 East State Street, where they "always sit and just chill." The others were drinking alcohol; defendant was smoking marijuana.

At some point, defendant walked toward the alleyway to urinate. Feeling "a little edgy" in view of the recent shooting death of a relative in the area, defendant asked his friend, Jack Isabell, "to look out for [him]." While standing in the alleyway, defendant heard what sounded like car brakes and car doors closing. Isabell exclaimed, "oh snap"; defendant "[t]ook off running." Defendant told the jury he ran because he was concerned someone had returned to the area "to kill a potential witness."

During cross-examination – without playing any portions of the video in court – the prosecutor confirmed defendant had seen the surveillance video and asked him to agree it did not depict eight people in front of 1162 East State Street. Defendant responded: "You can't really see nobody." The following exchange ensued:

PROSECUTOR:  So, there's nobody in front of 1162 on the video?

DEFENDANT:  No, it was people who sitting [sic]. It's two people sitting right there on 1162 and then it's a few more people sitting – both standing and sitting by the tree.

PROSECUTOR:  But you didn't see anybody sitting in the video, right?

DEFENDANT:  No.

The State presented three rebuttal witnesses to demonstrate an individual named Jack Isabell, who was born on a particular date, was incarcerated at the time of the incident.  Defense counsel countered that the detective had not checked all variations of Isabell's name.  The prosecutor did not play the seven-minute segment on rebuttal.

On summation, the prosecutor argued defendant's testimony was contradicted by the State's evidence.  Describing the unpublished seven-minute video footage, the prosecutor told the jury they were about to see that segment:

[Defendant] said that he and his friends, a total of about eight people, were hanging out on the steps of 1162 East State Street.  Now, when you see the video you're going to see that, okay, maybe there was three or four handful of people hanging out there [sic]. One, they were hanging out in front of 1160, not 1162. And two, you definitely can't see eight people out there.

Additionally, you're going to see whoever was out there in the beginning of the video, they've left the

6

scene about seven minutes before this incident occurred. At the time this happened there was absolutely nobody out there.

In addition, at the time of this incident you're going to see that the defendant was the only person in the alley. He told you Jack Isabell was out there. He was watching his back standing right outside of the alleyway. Watch the video. Tell me if you can see Jack Isabell. . . . I know that we've all seen the video. I just want to show about a seven-minute clip of when the video starts up until the point where this incident occurs. You see for yourself what you see in this video.

Defense counsel objected to the prosecutor's comments at sidebar, arguing it was unfair for the State to introduce "new sections" of the video that had not been played for the jury and narrated during trial. The prosecutor argued the segment was fair play because the entire recording was admitted in evidence. Noting defendant's "credibility [wa]s a central issue in this case," the prosecutor further contended it was his "trial strategy" to wait until summations to play the segment.

The trial court sustained the objection but seemingly ruled the jurors would be permitted to view any portion of the footage contained on the disc because "the entire video" recording had been admitted in evidence without redactions. The prosecutor's summation regarding the seven-minute segment continued as follows:

Now, I'm not going to show you the video right now. You saw portions of the video highlighted during direct examination of Detective Mancheno. Those portions of video that you saw didn't capture leading up to when Detective Mancheno arrives. The whole video is in evidence. If at any point you want to refer and take a look at what happened, you're more than welcome to do that. But I am going to represent to you that that [sic] video you cannot see eight people in front of 1162 East State Street, maybe three, maybe four at the most, and they're not in front of 1162, they're in front of 1160.

Additionally, anybody that was there in that video, they had already left about seven minutes before the police arrived. When the defendant said they were all hanging out when this happened, that's untrue because they were not there when this happened.

After deliberations commenced, the jury asked one question: "[W]e'd like to watch the video from seven minutes before the police showed up." The court overruled defendant's renewed objection and played the footage in open court for the jury without narration.[1] Shortly thereafter, the jury returned a guilty verdict.

---

[1] The court made no factual findings concerning the quality of the video recording, a copy of which was provided on appeal. We have examined the video; its images are by no means self-evident. The quality can best be described as grainy and, consistent with Mancheno's narration of other portions of the video played for the jury during trial, the images are "blurry." Although we, of course, defer to a trial court's factual findings, including those based solely on a video, State v. S.S., 229 N.J. 360, 374-75 (2017), we cannot do so here because the judge made no findings about the video. Instead, we

Defendant moved for a new trial, arguing the prosecutor's "playing of the videotape violated his Fourteenth Amendment right to a fair trial and his Sixth Amendment right to confront the witnesses against him."  Because the motion was filed two days beyond the time required by Rule 3:20-2, the trial court denied the motion as out of time.  Following defendant's motion for reconsideration, the court permitted briefing and issued a January 30, 2019 order.  The court denied the motion on the papers, without issuing an accompanying statement of reasons.[2]

At sentencing, the trial court granted the State's motion for a discretionary extended term as a persistent offender under N.J.S.A. 2C:44-3(a), on the second-degree certain persons not to possess a firearm conviction, N.J.S.A. 2C:39-7(b)(1), and sentenced defendant to a prison term of twelve years with a parole disqualifier of six years.  Pursuant to the pretrial stipulation

---

offer our impressions to place in context the issues surrounding the seven-minute segment.

[2]  Although the order states the court's "reasons were set forth in the opinion," appellate counsel confirmed the court did not issue a written opinion.  Nor is there any indication in the record that the court issued an oral decision.  See R. 1:7-4(a) (requiring the court to issue a written or oral decision, stating its factual findings and legal conclusions "on every motion decided by a written order that is appealable as of right").

between the parties, the court dismissed the remaining weapons offenses charged in the four-count Mercer County indictment.[3] This appeal followed.

On appeal, defendant raises a single point for our consideration, contending:

> THE DEFENDANT WAS DENIED A FAIR TRIAL WHEN, IN HIS SUMMATION, THE PROSECUTOR WAS ALLOWED TO MAKE REPRESENTATIONS ABOUT THE CONTENT OF A PORTION OF THE SURVEILLANCE VIDEO WHICH HAD NOT BEEN PLAYED FOR THE JURY DURING THE TESTIMONY, AND WHEN THAT SEGMENT WAS THEN PLAYED TO THE JURY FOR THE FIRST TIME DURING DELIBERATIONS.

## II.

We begin our review by reiterating seminal principles underscoring the prosecutor's responsibilities and duties. "Prosecutors are afforded considerable leeway in closing arguments as long as their comments are reasonably related to the scope of the evidence presented." State v. Frost, 158 N.J. 76, 82 (1999). Prosecutors are "expected to make vigorous and forceful closing arguments to

_____

[3] In addition to the certain persons offense, Indictment No. 17-12-0602 charged defendant with second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b)(1), fourth-degree possession of hollow nose bullets, N.J.S.A. 2C:39-3(f)(1), and fourth-degree resisting arrest, N.J.S.A. 2C:29-2(a)(2). Defendant also was charged in Indictment No. 18-08-0471 with aggravated assault on an officer, N.J.S.A. 2C:12-1(b)(5)(a), committed while defendant was incarcerated pending trial on the present matter. Defendant pled guilty to that offense and was sentenced to a concurrent three-year prison term.

10

juries." Ibid.; see also State v. Williams, 244 N.J. 592, 607 (2021).

"New Jersey courts have commented repeatedly on the special role filled by those entrusted with the responsibility to represent the State in criminal matters, observing that the primary duty of a prosecutor is not to obtain convictions but to see that justice is done." State v. Smith, 212 N.J. 365, 402-03 (2012). "A prosecutor must 'conscientiously and ethically undertak[e] the difficult task of maintaining the precarious balance between promoting justice and achieving a conviction,' ensuring that at all times his or her 'remarks and actions [are] consistent with his or her duty to ensure that justice is achieved.'" State v. Jackson, 211 N.J. 394, 408 (2012) (alterations in original) (quoting State v. Williams, 113 N.J. 393, 447-48 (1988)). "As the representative of the State, [the prosecutor's] obligation to play fair is as compelling as his [or her] responsibility to protect the public." State v. Marks, 201 N.J. Super. 514, 535 (App. Div. 1985). "Prosecutors are required to turn square corners because their overriding duty is to do justice." State v. Garcia, 245 N.J. 412, 418 (2021).

National standards are in agreement with these fundamental concepts. See ABA Standards for Crim. Just.: Functions and Duties of the Prosecutor § 3-1.2(b) (4th ed. 2017) ("The primary duty of the prosecutor is to seek justice within the bounds of the law, not merely to convict."). Indeed, nearly a

century ago in <u>Berger v. United States</u>, Justice Sutherland wrote: "It is as much [a prosecutor's] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." 295 U.S. 78, 88 (1935); <u>see also</u> <u>Smith</u>, 212 N.J. at 403; <u>State v. Farrell</u>, 61 N.J. 99, 105 (1972).

Because jurors are likely to accord special deference to the comments of the prosecutor, <u>see</u> <u>State v. Walden</u>, 370 N.J. Super. 549, 558 (App. Div. 2004), courts have identified particular conduct that must be avoided. As one notable example, prosecutors must refrain from opining "in such manner that the jury may understand the opinion or belief to be based upon something which [the prosecutor] knows outside the evidence." <u>State v. Thornton</u>, 38 N.J. 380, 398 (1962). Thus, prosecutors "<u>must confine their comments to evidence revealed during the trial</u> and reasonable inferences to be drawn from that evidence." <u>State v. Smith</u>, 167 N.J. 158, 178 (2001) (emphasis added); <u>see also</u> <u>State v. Blakney</u>, 189 N.J. 88, 96 (2006) (recognizing a prosecutor's "duty is to prove the State's case based on the evidence").

Even if the prosecutor exceeded the bounds of proper conduct, however, that finding does not end our inquiry. "[T]o justify reversal, the misconduct must have been 'so egregious that it deprived the defendant of a fair trial.'" <u>Smith</u>, 167 N.J. at 181 (quoting <u>Frost</u>, 158 N.J. at 83). Stated another way,

A-4156-19

reversal is warranted where the conduct of the prosecutor was "clearly and unmistakably improper," and "substantially prejudiced [the] defendant's fundamental right to have a jury fairly evaluate the merits of his [or her] defense." State v. Timmendequas, 161 N.J. 515, 575 (1999).

In a similar vein, our review of a trial court's evidentiary rulings is limited. We will not overturn a trial court's evidentiary rulings unless it is clear the trial court palpably abused its discretion. State v. R.Y., 242 N.J. 48, 64-65 (2020). Deference will not be afforded, however, if the court has misapplied the law to an evidentiary issue. See State v. Hathaway, 222 N.J. 453, 467 (2015).

Evidentiary material has evolved with the rapid advances in technology. Long gone is the typewritten question-and-answer memorialization of a police interrogation, now replaced with the video recording of a defendant's interrogation – and for obvious good reasons. See e.g., State v. Cook, 179 N.J. 533, 556 (2004) (recognizing video-recorded interrogations "enhance a judge or juror's assessment of credibility by providing a more complete picture of what occurred" (quoting Heath S. Berger, Let's Go to the Videotape: A Proposal to Legislate Videotaping of Confessions, 3 Alb. L.J. Sci. & Tech. 165, 173-74 (1993))).

Today, video recording devices abound, particularly on city streets as evidenced by the present case. Increasing use of cameras from various sources may readily capture crimes in progress. See Video Evidence: A Primer for Prosecutors, 3, U.S. Dep't of Just., Bureau of Just. Assistance (Oct. 2016) https://it.ojp.gov/GIST/1194/File/FINAL-Video-Evidence-Primer-for-Prosecutors.pdf/ (listing examples of video-recorded evidence, including business and residential security cameras; traffic cameras; police unit cameras; and police body-worn cameras). Crime scenes now often come to life in the courtroom. As our Supreme Court recently observed: "The power of a video of contemporaneously recorded events at the crime scene can hardly be disputed." Garcia, 245 N.J. at 431.

At present, no rule of evidence specifically addresses whether segments of a video recording that were not published to the jury during trial are nonetheless "in evidence" when the entire video recording is admitted in evidence without redactions. However, Justice LaVecchia's dissenting comments in State v. McNeil-Thomas are instructive:

> It is certainly permissible for the State to highlight particular evidence during summation. For example, the State could take words from a single document out of hundreds admitted in evidence in bulk and present the key language in large type on a poster board or a power point presentation to the jury. But the difference is that the document is clear-cut, easily perceived evidence. [A] grainy surveillance

video is not of the same ilk.  It require[s] translation or narration, not previously testified to by any witness, for the jury to perceive what the prosecutor declared the video depicted.

[238 N.J. 256, 292 (2019) (LaVecchia, J., dissenting) (emphasis added).]

Here, both parties cite the majority opinion in McNeil-Thomas to support their counterarguments on appeal.  In McNeil-Thomas, the Supreme Court considered the defendant's contention that the State erroneously played a portion of a surveillance video during summation that had not been displayed to the jury at trial.  Id. at 271.  That case involved the fatal shooting of an off-duty police officer, who was not the defendant's intended target.  Id. at 261, 264.  In summation, the prosecutor played segments of a video recording to suggest the defendant drove by the restaurant prior to the shooting to ensure his intended targets were still at the restaurant.  Id. at 267.

During deliberations, the jury asked to view the clip.  Id. at 289.  The jury's note specifically stated it wished to view the segment that "was only shown by the Prosecutor at the closing statement."  Ibid.  Apparently concluding the jurors were mistaken and the clip had been admitted in evidence, the judge granted the jury's request.  Ibid.  Deferring to the trial judge's findings, the Court concluded the trial judge did not abuse his discretion by permitting the State to play the requested clip during summation,

15

reversing our decision to the contrary. Id. at 272-74. In the present matter, conversely, it was never disputed that the seven-minute segment was not shown to the jury at any time prior to the close of evidence.

In our view, the Court's opinion in McNeil-Thomas implicitly held those portions of video-recorded evidence displayed to the jury during trial are fair game in summation, while those segments contained in the same video recording that are not shown are not "in evidence" and must not be commented on. The reason for this is straightforward: video-recorded evidence, as Justice LaVecchia observed, stands apart from documentary evidence. Id. at 292 (LaVecchia, J., dissenting). Unlike documentary evidence, video-recorded evidence often is unclear and needs narration to place the scene in context, while documentary evidence usually speaks for itself. Ibid.

We therefore expressly hold the admission of video-recorded evidence is properly limited to only those segments played for the jury during trial, even when the entire video recording purportedly has been admitted in evidence. Accordingly, we conclude counsel are prohibited from commenting on the unshown segments in their closing remarks to the jury.[4] Our decision finds

---

[4] Although the propriety of the prosecutor's opening statement is not at issue in this appeal, any reference to video recordings in opening statements should be limited to the anticipated trial evidence. See State v. Greene, 242 N.J. 530, 548 (2020).

support in prior decisions.  See State v. Boston, 469 N.J. Super. 223, 236 n.3 (App. Div. 2021) (refusing to consider those portions of a dash camera video recording that were "not played for the jury as part of the trial record"); see also Hayes v. Delamotte, 231 N.J. 373, 389 (2018) (noting the expert surgeon's "videotaped deposition was in evidence once it was played at trial").

Turning to the present matter, the prosecutor's comments on the seven-minute segment and the trial court's decision to play that footage during the jury's deliberations, at best, were based on a misunderstanding of the nature of the video recording admitted in evidence at trial.  Both the State and the trial court seemed to adhere to the concept that once an exhibit is admitted in evidence, any portion of that exhibit may be displayed to the jury.

Nonetheless, "the manner and timing" of the presentation of the seven-minute segment to the jury "prevented defendant from any opportunity to rebut the 'evidence.'"  McNeil-Thomas, 238 N.J. at 291 (LaVecchia, J., dissenting).  Indeed, during cross-examination, defendant agreed with the prosecutor that the video recording did not depict the eight people sitting in front of 1162 East State Street.  But defendant also stated some people were "standing and sitting by the tree."  As the prosecutor argued before the trial court, defendant's testimony squarely placed his credibility in issue.  Notably, the State produced no forensic evidence tying defendant to the handgun.  Because defendant was

17

not afforded the opportunity to view and narrate the recording when he testified,[5] he was unable to address the footage when the prosecutor commented on it in summation and invited the jury to view it without narration during its deliberations. Thus, the prosecutor's "improper gamesmanship had the clear capacity to unfairly tip the scales in this pitched credibility contest." Garcia, 245 N.J. at 417.

Even were we to conclude the State presented to the jury substantial evidence of defendant's guilt, see State v. R.B., 183 N.J. 308, 330-31 (2005), the prosecutor's blatantly unfair "trial strategy" rose to the level of conduct that "deprived . . . defendant of a fair trial," Frost, 158 N.J. at 83; see also Greene, 242 N.J. at 547 (reiterating the "simple yet fundamental principle that the accused is guaranteed the right to a fair trial by our Federal and State Constitutions"); U.S. Const. amends. V, VI; N.J. Const. art. I, ¶ 1. We are not persuaded by the State's contentions that defendant, having provided the video

---

[5] Playing the seven-minute segment during defendant's testimony would have obviated the authentication issue, raised by defendant for the first time on appeal. Despite defendant's belated argument, we agree that the seven-minute footage was not properly authenticated. Mancheno testified the recording fairly and accurately represented the events as they occurred on the date of the incident – but he was not present during the segment at issue. Because Mancheno did not perceive the events as they occurred before he arrived at the scene, the first seven minutes of the video played during jury deliberations were not properly authenticated. See N.J.R.E. 901; State v. Wilson, 135 N.J. 4, 15 (1994).

recording to the State, was fully aware of the seven-minute segment and did not object to the admission in evidence of the entire recording. Those arguments misapprehend the prosecutor's "improper gamesmanship." See Garcia, 245 N.J. at 417. We further conclude the trial court mistakenly admitted the entire video recording in evidence, including portions not played before the jury, a decision that does not warrant our deference. See Hathaway, 222 N.J. at 467. The confluence of errors presented in this case – intended or not – requires reversal and a new trial.

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION