SYLLABUS

This syllabus is not part of the Court's opinion.  It has been prepared by the Office of the Clerk for the convenience of the reader.  It has been neither reviewed nor approved by the Court.  In the interest of brevity, portions of an opinion may not have been summarized.

**State v. Damon Williams (A-46-19) (083532)**

**Argued September 29, 2020 -- Decided January 19, 2021**

**SOLOMON, J., writing for the Court.**

In this appeal, the Court considers whether the prosecutor's comments and use of a particular PowerPoint slide in her closing at the trial of defendant Damon Williams amounted to prejudicial error.

In 2014, defendant entered a Bank of America branch.  He approached the window of Maria Cervantes, a bank teller in her early twenties, bent down until the two were at eye level, and leaned toward the bars above the counter separating tellers from customers.  Defendant then passed Cervantes a note that said, "Please, all the money, 100, 50, 20, 10.  Thank you."  Cervantes opened her cash drawer and gave defendant about $4,600.  When she tried to include a pack of $20 bills containing a GPS tracker and a device that would trigger a silent alarm, defendant instructed her not to.  During the encounter, defendant did not produce a weapon or threaten the use of a weapon, nor did he verbally threaten violence if Cervantes did not comply with his request.  Defendant then walked out of the bank and another teller triggered the alarm.

The central trial issue was whether defendant committed second-degree robbery -- theft using force or the threat of force, purposely putting Cervantes in fear of immediate bodily injury -- or third degree theft -- exercising unlawful control over the movable property of another with purpose to deprive him thereof.

Throughout the trial, the State repeated the theme "actions speak louder than words."  During her summation, the prosecutor displayed to the jury a PowerPoint slide with the heading "ACTIONS SPEAK LOUDER THAN WORDS."  The slide contained a still-shot from the movie The Shining, depicting Jack Nicholson in his role as a violent psychopath who used an ax to break through a door while attempting to kill his family.  The slide featured the words spoken by Nicholson in the movie as he stuck his head through the broken door -- "Here's Johnny!"  The prosecutor commented that the character was "saying some very unthreatening words, 'Here's Johnny.'  But if you have ever seen the movie The Shining, you know how his face gets through that door.  So, again, I just point that out to illustrate.  It's not just the words; it's what you do before and what you do after the words that matters.  And that's what makes this a robbery."

1

After the prosecutor concluded her summation, defense counsel objected to the photo's use. During a colloquy, the trial judge offered a curative instruction, but stated, "If I do that though, I'm underscoring again, the prosecution's arguments." Defense counsel ultimately agreed that "it may be best left alone." Thus, the court did not give a curative instruction. The jury convicted defendant of second-degree robbery.

On appeal, defendant argued that the prosecutor's use of the PowerPoint slide during summation denied defendant a fair trial. The Appellate Division affirmed the conviction. The Court granted certification limited to that issue. 241 N.J. 9 (2020).

**HELD:** The prosecutor's comments and use of the PowerPoint slide amounted to prejudicial error.

1. The duty of a prosecutor is as much to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one. While prosecutors are expected to make vigorous and forceful closing arguments to juries, their comments should be reasonably related to the scope of the evidence presented. References to matters extraneous to the evidence may constitute prosecutorial misconduct. When a prosecutor's remarks stray over the line of permissible commentary, courts must weigh the severity of the misconduct and its prejudicial effect on the defendant's right to a fair trial. Courts reverse a conviction only if the prosecutorial misconduct was so egregious as to deprive defendant of a fair trial. Factors to be considered in making that decision include: "(1) whether defense counsel made timely and proper objections to the improper remarks; (2) whether the remarks were withdrawn promptly; and (3) whether the court ordered the remarks stricken from the record and instructed the jury to disregard them." State v. Frost, 158 N.J. 76, 83 (1999). Here, the State admits it erred in using the PowerPoint image during summation but asserts the error was not clearly capable of producing an unjust result. (pp. 13-16)

2. The Court reviews in detail four cases in which it considered whether prosecutorial errors deprived the defendant of their right to a fair trial. In State v. Feaster, 156 N.J. 1 (1998); State v. Jackson, 211 N.J. 394 (2012); and State v. McNeil-Thomas, 238 N.J. 256 (2019), the Court found the prosecutors' errors to be harmless after noting such considerations as the evidence adduced, lack of objection, use of a curative instruction, and whether the challenged statements were fair comment on the evidence. In Frost, the Court found the prosecutor's summation constituted prejudicial prosecutorial misconduct: there, the prosecutor made a clear misstatement of the law, improperly vouched for a witness's credibility, and disparaged defense counsel; despite defense counsel's objections, moreover, the court did not strike any of the comments or provide a limiting instruction. Those cases make clear that, in closing, prosecutors are obliged to confine their comments to the evidence admitted and reasonable inferences drawn therefrom. Failing to do so may imply that facts or circumstances exist beyond what has been presented to the jury and encroach upon a defendant's right to a fair trial. (pp. 16-22)

2

3. During summation, to convey the supposed threatening nature of defendant's note, conduct, and words, the prosecutor displayed the still shot from The Shining while making the comments noted above. Unlike in the movie scene, no act of physical violence preceded the handing of the note or followed the handing the money to defendant. The prosecutor nevertheless asked the jury to infer from the photograph and the words "Here's Johnny!" that defendant's words and "actions" purposefully put Cervantes in fear of immediate bodily injury. Comments by a prosecutor in closing that stray beyond the evidence and the reasonable inferences therefrom are inappropriate and improper. The prosecutor here went far beyond the evidence to draw a parallel between defendant's conduct and that of a horror-movie villain. (pp. 23-25)

4. Defense counsel did offer a timely objection, and the trial court suggested that a curative instruction might highlight the photograph and remarks. Also, the prosecutor's comments were neither withdrawn nor stricken from the record. The application of the Frost factors here does not undermine defendant's claims. (pp. 25-26)

5. Whether defendant purposely put Cervantes in fear of immediate bodily injury -- thus supporting a conviction for robbery, not theft -- was a close call here. The prosecutor's comments and the extra-evidentiary movie photo made it more likely that the jury would reject the defense that only a theft occurred. Thus, the prosecutor's conduct during summation was clearly capable of having an unfair impact on the jury's deliberations, intruded upon defendant's right to a fair trial, and constituted reversible error. (p. 26)

6. To avoid objection or possible error, the Court encourages counsel to disclose to each other and the court any visual aids intended to be used during closing argument, but does not require that practice. Nevertheless, the Court reminds prosecutors that they must ensure their strategy and commentary fall within the boundaries of permissibly forceful advocacy. Prosecutors must walk a fine line when making comparisons, whether implicit or explicit, between a defendant and an individual whom the jury associates with violence or guilt. The use of a sensational and provocative image in service of such a comparison, even when purportedly metaphorical, heightens the risk of an improper prejudicial effect on the jury. Such a risk was borne out here. Visual aids such as PowerPoint presentations must adhere to the same standards as counsels' spoken words. Slides may not be used to put forward impermissible evidence or make improper arguments before the jury. A PowerPoint may not be used to make an argument visually that could not be made orally. The PowerPoint here fell short of that standard. (pp. 26-28)

**The judgment of the Appellate Division is REVERSED, defendant's conviction is VACATED, and the matter is REMANDED for a new trial.**

**CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, ALBIN, PATTERSON, FERNANDEZ-VINA, and PIERRE-LOUIS join in JUSTICE SOLOMON'S opinion.**

3

State of New Jersey,

Plaintiff-Respondent,

v.

Damon Williams, a/k/a
Danen Williams, David Bowman, and
Damon Bailey,

Defendant-Appellant.

On certification to the Superior Court,
Appellate Division.

| Argued | Decided |
|---|---|
| September 29, 2020 | January 19, 2021 |

Alison Gifford, Assistant Deputy Public Defender,
argued the cause for appellant (Joseph E. Krakora, Public
Defender, attorney; Alison Gifford, of counsel and on the
briefs, and Frank M. Gennaro, Designated Counsel, on
the briefs).

Jason Magid, Special Deputy Attorney General/Acting
Assistant Prosecutor, argued the cause for respondent
(Jill S. Mayer, Acting Camden County Prosecutor,
attorney; Nancy P. Scharff, Special Deputy Attorney
General/Acting Assistant Prosecutor, on the brief).

Alexander Shalom argued the cause for amicus curiae
American Civil Liberties Union of New Jersey
(American Civil Liberties Union of New Jersey

1

Foundation, attorneys; Alexander Shalom, and Jeanne
LoCicero, on the brief).

Carol M. Henderson, Assistant Attorney General,
argued the cause for amicus curiae Attorney General
of New Jersey (Gurbir S. Grewal, Attorney General,
attorney; Carol M. Henderson, of counsel and on the
brief).

JUSTICE SOLOMON delivered the opinion of the Court.

Defendant Damon Williams was charged with robbing a bank. In the course of the alleged robbery, defendant did not display a weapon or make a verbal threat. Instead, he passed a note to a young female teller which said, "Please, all the money, 100, 50, 20, 10. Thank you." The central issue at trial was whether defendant committed second-degree robbery -- theft using force or the threat of force -- or third-degree theft -- exercising unlawful control over the movable property of another. The jury convicted defendant of robbery.

In this appeal, we consider whether the jury might have reached that result because the prosecutor showed the jury a PowerPoint presentation in her closing that contained a still photograph from the movie The Shining and commented, "if you have ever seen the movie The Shining, you know how his face gets through that door." The PowerPoint slide depicted Jack Nicholson in his role as a violent psychopath who used an ax to break through a door while attempting to kill his family. The photograph contained the words spoken by

2

Nicholson in the movie scene as he stuck his head through the broken door -- "Here's Johnny!" The slide also bore the heading "ACTIONS SPEAK LOUDER THAN WORDS," a theme used by the State throughout the trial to suggest to the jury that defendant's conduct in the moments leading up to and following defendant's passing the note to the teller supported a finding of robbery when viewed in context. The photograph was not previously shown to the court or defense counsel and had not been used at trial or offered or admitted into evidence.

We determine that the prosecutor's comments and use of the PowerPoint slide amounted to prejudicial error. We therefore reverse the judgment of the Appellate Division, vacate defendant's conviction, and remand for a new trial.

I.

The appellate record reveals that in the summer of 2014, defendant entered a Bank of America branch in Merchantville, Camden County, carrying a bag and wearing a sweatshirt, dark pants, a New York Giants hat, and aviator sunglasses; his fingertips were covered by band-aids. As he approached the window of Maria Cervantes, a bank teller in her early twenties, defendant bent down until the two were at eye level and leaned toward the bars above the counter separating tellers from customers. Defendant then passed Cervantes a note that said, "Please, all the money, 100, 50, 20, 10. Thank you." Cervantes

3

opened her cash drawer and gave defendant about $4,600. When she tried to include a pack of $20 bills containing a GPS tracker and a device that would trigger a silent alarm, defendant instructed her not to. During the encounter, defendant did not produce a weapon or threaten the use of a weapon, nor did he verbally threaten violence if Cervantes did not comply with his request. Defendant then walked out of the bank and another teller, Rachel Cowgill, triggered the alarm.

Fingerprint evidence lifted from the note handed to Cervantes identified defendant, and officers arrested him several weeks later. A Camden County grand jury indicted defendant for one count of second-degree robbery, contrary to N.J.S.A. 2C:15-1(a)(2).

At trial, during opening statements, the prosecutor said that a theme of the case would be "actions speak louder than words," to emphasize that defendant's actions amounted to more than "just a mere request for money." In response, defense counsel highlighted that defendant did not use a weapon or force, pointing out that the fundamental question before the jury was whether defendant "deliberately, consciously, intentionally, purposefully placed Maria Cervantes in fear of immediate bodily injury." Thus, the central

4

trial issue was whether defendant committed second-degree robbery[1] under N.J.S.A. 2C:15-1(a)(2) -- theft using force or the threat of force, purposely putting Cervantes in fear of immediate bodily injury -- or third degree theft[2] under N.J.S.A. 2C:20-3(a) -- exercising unlawful control over the "movable property of another with purpose to deprive him thereof" -- a lesser-included offense of robbery.

At trial, Cowgill, who was standing less than a foot away from Cervantes during her encounter with defendant, testified on behalf of the State. She recounted that defendant wore "heavy dress" during the middle of the summer, along with a hat "that was pulled down" and sunglasses. According to Cowgill, defendant, who was over six feet tall, approached Cervantes, who was about "five two," when she finished with another customer and crouched down to "eye level" with her. Cowgill described defendant as "pretty much on top" of the metal gate separating tellers from customers. Although she did not

---

[1] Second-degree robbery carries an ordinary term of five to ten years' imprisonment. N.J.S.A. 2C:43-6(a). As a result of defendant's significant criminal history, which included eleven convictions as an adult, defendant qualified as a repeat violent offender under N.J.S.A. 2C:43-7.1(b)(1), or as a persistent offender under N.J.S.A. 2C:44-3(a), and was therefore eligible for an extended term sentence of between ten and twenty years for a second-degree robbery conviction, N.J.S.A. 2C:43-7(a)(3).

[2] Pursuant to N.J.S.A. 2C:43-6, a conviction of third-degree theft calls for a term of imprisonment of between three and five years, or an extended term sentence of five to ten years, N.J.S.A. 2C:43-7(a)(4).

see defendant pass the note to Cervantes, Cowgill observed defendant pointing to the note, which caused Cervantes to begin shaking visibly. Cowgill testified further that when Cervantes attempted to include a pack of $20 bills containing a GPS tracker, defendant forcefully said, "No, leave that there." Cowgill stated that she watched defendant walk out of the bank and then looked at Cervantes, who "started crying and shaking." Cowgill then yelled for her manager and triggered the alarm system.

Cervantes testified that upon receiving the note from defendant, she felt she "had to do what the note said, and was very scared." She affirmed that although "[defendant] didn't display a weapon or attempt to reach for a weapon" she felt threatened and "was still very scared" because she "didn't know what he could have in his pockets."

Surveillance video footage from the bank showed defendant, dressed in the clothing described by Cowgill, walking across the bank's parking lot into the bank. Other video footage captured the encounter between Cervantes and defendant.

Throughout the trial, the State repeated the theme "actions speak louder than words." During her summation, the prosecutor displayed to the jury a PowerPoint slide with the heading "ACTIONS SPEAK LOUDER THAN

6

WORDS," containing the still-shot of Jack Nicholson from <u>The Shining</u>, and said:

> We've all seen this, right?  This movie?  And, you know, these words, "Here's Johnny."  Right?  If you've never seen the movie, <u>The Shining</u>, this is creepy, but not scary, right?  You've never seen it.  All right.  This guy looks creepy and he's saying some very unthreatening words, "Here's Johnny."[3]  But if you have ever seen the movie <u>The Shining</u>, you know how his face gets through that door.  So, again, I just point that out to illustrate.  It's not just the words; it's what you do before and what you do after the words that matters.  And that's what makes this a robbery.

After the prosecutor concluded her summation, defense counsel objected to the photo's use.  A colloquy ensued, the pertinent parts of which are as follows:

> Defense counsel:  Jack Nicholson's face is through the broken door.  That is preceded by him smashing that door with an ax.  So, that is clearly --
>
> The Court:  Is that what was on there?
>
> Prosecutor:  No.
>
> . . . .
>
> Defense counsel:  I mean for those who are familiar with the film understand the context that the door was

---

[3] The movie quoted the words used to introduce the star of the nighttime television talk show, "The Tonight Show Starring Johnny Carson," that aired for thirty years beginning in 1962.  A&E Television Networks, <u>Johnny Carson Makes Debut as "Tonight Show" Host (November 13, 2009)</u>, https://www.history.com/this-day-in-history/johnny-carson-makes-debut-as-tonight-show-host.

smashed with an ax, and that is certainly far more than what occurred in this case. So, you know, we're talking about use of force or the threat of force, and that was certainly preceded by the threat of immediate bodily injury -- immediate bodily injury whereas our argument here is that this case doesn't include those kinds of facts.

. . . .

Defense counsel: Like I said, my concern is that those familiar with the film, and probably everybody is working in the back of their minds the facts that he smashed that door with an ax, so.

The Court: Okay. Well, is there anything you want me to say?

Defense Counsel: Just that the State gave an illustration with -- showing a clip from a -- not a clip, but a picture, a still from a film, and only meant to illustrate what? I'm asking.

Prosecutor: That it's not the words -- it's not the words "Hey Johnny" alone.

During the colloquy, the trial judge offered a curative instruction, but stated, "If I do that though, I'm underscoring again, the prosecution's arguments. So, it's -- always with those curatives is always a double-edged sword." Defense counsel ultimately agreed that "it may be best left alone." Thus, the court did not give a curative instruction. The jury convicted defendant of second-degree robbery. After the trial court denied defendant's

8

motion for a new trial, it sentenced defendant to an extended term of fourteen years' imprisonment, subject to the No Early Release Act, N.J.S.A. 2C:43-7.2.

On appeal, defendant argued that the prosecutor's use of the PowerPoint slide during summation denied defendant a fair trial. Specifically, defendant argued the photograph was an inflammatory visual aid, not in evidence, that bore no relation to the facts before the jury.

In response, the State urged that the prosecutor's reference to the PowerPoint slide be considered in the context of whether a robbery had been committed, given the absence of force or an overt threat of force by defendant. The State maintained the photograph showed only that the jury should consider defendant's conduct, not his words alone. And, although the State conceded it was inappropriate to use the photograph, the State argued its use was harmless, given the overwhelming evidence of defendant's guilt.

The Appellate Division acknowledged that the prosecutor's remarks were not stricken from the record or withdrawn and highlighted the trial court's offer to provide a curative instruction, which was rejected by defense counsel. In the end, the Appellate Division affirmed defendant's conviction and sentence, finding that the prosecutor's remarks and the photograph from The Shining, though unexpected, did not constitute prosecutorial misconduct warranting reversal:

Taken in that context, the State's fleeting comments about The Shining at the end of a multi-day trial with ample witness testimony and documentary evidence to support the conviction, and in recognition of the considerable leeway accorded the State in closing arguments, were not so egregious as to constitute prosecutorial misconduct.

We granted defendant's certification petition, limited to the issue of "whether the prosecutor committed misconduct during summation by using a still photograph taken from a movie and by comparing defendant's conduct to that of the character depicted in the photograph." 241 N.J. 9 (2020). We also granted amicus curiae status to the American Civil Liberties Union of New Jersey (ACLU) and to the Attorney General of New Jersey (Attorney General).

II.

The parties' arguments here mirror those raised in the Appellate Division. According to defendant, the prosecutor committed reversible error by using the image from The Shining during summation. Specifically, defendant contends the prosecutor "invited a comparison between the conduct of [defendant], who was accused of nonviolent robbery, and Nicholson's character, who used an ax to break through a door while attempting to kill his family."

Defendant asserts that whether he purposely put Cervantes in fear of immediate bodily injury was a "close call," and the movie photograph "made it

10

more likely that the jury would reject the defense" that only a theft occurred. Thus, according to defendant, the prosecutor's conduct during summation was "clearly capable of having an unfair impact on the jury's deliberations." To avoid the risk of similar errors in the future, defendant suggests that the Court adopt a prophylactic rule requiring prosecutors to provide opposing counsel with its PowerPoint presentations before openings and summations.

The ACLU agrees with defendant's arguments and contends that even where an image serves a legitimate purpose, if it goes beyond what the prosecutor could convey verbally, its use amounts to error. Recognizing that threats can be both verbal and non-verbal, the ACLU argues the problem here stems from the message, not the topic of discussion. The ACLU submits further that had the prosecutor made the comparison orally and not by PowerPoint, the court certainly would have interceded.

The State contends that, in her summation, the prosecutor sought to place focus on defendant's "implicitly threatening" actions, and held fast to this notion even when the movie photograph was shown. The State concedes that "the prosecutor should have made this argument without utilizing the photograph," but contends that "when the tenor of the trial and the actions taken by the court and defense counsel in addressing this issue are taken into consideration, these brief comments do not rise to the level of reversible misconduct." The State highlights that it was

11

"abundantly clear" to the jury that no weapons or verbal threats were used, and the judge and defense counsel agreed that a curative instruction about the movie photograph was not the best course of action.

The State further contends that the "court repeatedly instructed the jury that it was to consider only the evidence in reaching its verdict[,] and that the arguments of counsel, including closing statements, were not evidence." The State also argues defendant "was not unduly prejudiced by the prosecutor's comments, which were reasonably related to the scope of evidence." Finally, the State claims that the prosecutor's summation "did not substantially prejudice the defendant[] given the overwhelming evidence of his guilt."

The Attorney General largely reiterates the arguments advanced by the State. In addition, the Attorney General submits that defendant is not entitled to relief from this Court because he declined a curative instruction. The Attorney General also highlights that defendant never moved for a mistrial based on the prosecutor's use of the PowerPoint slide. Lastly, the Attorney General rejects defendant's request that this Court adopt a prophylactic rule requiring prosecutors to provide to opposing counsel any PowerPoint presentations intended to be used before openings and summations. According to the Attorney General, such a remedy would provide the defense with

12

advance notice of what the prosecutor plans to say in closing and allow defense counsel to tailor his or her summation accordingly.

### III.

### A.

We begin our discussion of the law applicable to this appeal by acknowledging the role prosecutors play in the criminal justice system. We recognize that role to be "'uniquely challenging' because it is a 'double calling' -- to represent vigorously the state's interest in law enforcement and at the same time help assure that the accused is treated fairly and that justice is done." State v. McNeil-Thomas, 238 N.J. 256, 274 (2019) (quoting State v. Ramseur, 106 N.J. 123, 323-24 (1987)). Having said that, the fundamental obligation of those representing the State in criminal prosecutions is not to convict, "but to see that justice is done." State v. Frost, 158 N.J. 76, 83 (1999) (quoting Ramseur, 106 N.J. at 320). "If fairness and justice are forgotten in the pursuit of a guilty verdict, the integrity and authority of our criminal justice system is challenged." State v. Smith, 212 N.J. 365, 403 (2012) (quoting State v. Goode, 278 N.J. Super. 85, 91-92 (App. Div. 1994)). So, "[t]he duty of the prosecutor 'is as much . . . to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.'" Ibid. (ellipsis in original) (quoting Frost, 158 N.J. at

13

83). Prosecutors therefore "may strike hard blows, [but] not . . . foul ones." <u>Ibid.</u> (alteration and ellipsis in original) (quoting <u>State v. Feaster</u>, 156 N.J. 1, 59 (1998)).

While "prosecutors in criminal cases are expected to make vigorous and forceful closing arguments to juries" and are "afforded considerable leeway," "their comments [should be] reasonably related to the scope of the evidence presented." <u>Frost</u>, 158 N.J. at 82. "[R]eferences to matters extraneous to the evidence" may constitute prosecutorial misconduct. <u>State v. Jackson</u>, 211 N.J. 394, 408 (2012). "In other words, as long as the prosecutor 'stays within the evidence and the legitimate inferences therefrom,'" <u>McNeil-Thomas</u>, 238 N.J. at 275 (quoting <u>State v. R.B.</u>, 183 N.J. 308, 330 (2005)), "[t]here is no error," <u>ibid.</u> (quoting <u>State v. Carter</u>, 91 N.J. 86, 125 (1982)).

B.

Notwithstanding the prosecutor's obligation to ensure that justice is served, "even when a prosecutor's remarks stray over the line of permissible commentary, our inquiry does not end." <u>Ibid.</u> Rather, we must weigh "the severity of the misconduct and its prejudicial effect on the defendant's right to a fair trial," <u>State v. Wakefield</u>, 190 N.J. 397, 437 (2007), and reverse a conviction on the basis of prosecutorial misconduct only if "the conduct was so egregious as to deprive defendant of a fair trial," <u>ibid.</u> (quoting <u>State v. Papasavvas</u>, 163 N.J. 565, 625 (2000)).

14

In deciding whether prosecutorial conduct deprived a defendant of a fair trial, "an appellate court must take into account the tenor of the trial and the degree of responsiveness of both counsel and the court to improprieties when they occurred." Frost, 158 N.J. at 83 (quoting State v. Marshall, 123 N.J. 1, 153 (1991)). Factors to be considered in making that decision include, "(1) whether defense counsel made timely and proper objections to the improper remarks; (2) whether the remarks were withdrawn promptly; and (3) whether the court ordered the remarks stricken from the record and instructed the jury to disregard them." Ibid.

Here, the State admits that it erred in using the PowerPoint image from The Shining during summation but asserts that the error was harmless -- not "of such a nature as to have been clearly capable of producing an unjust result." R.B., 183 N.J. at 330 (quoting R. 2:10-2).

"[W]hether an error is harmless depends upon some degree of possibility that it led to an unjust verdict. The possibility must be real, one sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached." State v. Bankston, 63 N.J. 263, 273 (1973). Said another way, "the prosecutor's conduct must 'substantially prejudice the defendant's fundamental right to have a jury fairly evaluate the merits of his defense.'" State v. Roach, 146 N.J. 208, 219 (1996) (quoting State v. Bucanis, 26 N.J. 45, 56 (1958)). When that occurs, a prosecutor breaches his or her responsibility to see that

15

"justice is done." <u>Frost</u>, 158 N.J. at 83. It is in this context that we will determine whether the prosecutor's error in summation here -- showing the jury a PowerPoint slide containing a still photograph from the movie <u>The Shining</u> with the words "Here's Johnny!" and the heading "ACTIONS SPEAK LOUDER THAN WORDS" -- was harmless or violated defendant's "right to a fair trial." <u>See</u> <u>Jackson</u>, 211 N.J. at 407.

C.

Turning to our jurisprudence regarding prosecutorial errors, our cases on the question are particularly instructive -- <u>State v. Feaster</u>, <u>State v. Frost</u>, <u>State v. Jackson</u>, and <u>State v. McNeil-Thomas</u>. In each of those cases, we considered whether prosecutorial errors deprived the defendant of their right to a fair trial. In <u>Feaster</u>, <u>Jackson</u>, and <u>McNeil-Thomas,</u> we found the prosecutors' errors to be harmless. In <u>Frost</u>, we reversed the defendant's conviction for prosecutorial misconduct.

As a starting point, in <u>Feaster</u>, we articulated that a prosecutor commits error by communicating to the jury that the State possesses knowledge beyond the evidence presented. 156 N.J. at 59. The defendant in <u>Feaster</u> was on trial for the murder of an attendant working at a Texaco gas station in Deptford Township. <u>Id.</u> at 26. For dramatic effect, the prosecutor stated during closing argument that the defendant loaded his gun and cocked the weapon's hammer on the ride to the

16

Texaco station.  Id. at 62.  The prosecutor similarly asserted that the defendant "approached the victim from 'the blind side' and that he 'shoulder[ed]' in the door" of the station.  Id. at 56-58 (alteration in original).  But neither of the prosecutor's remarks were supported by any evidence submitted to the jury.  While defense counsel objected to some of the prosecutor's statements, he did not request a curative instruction or a mistrial.  Id. at 58.

In Feaster, we determined the prosecutor's comments were inappropriate because he strayed beyond the evidence without any "basis in the record."  Id. at 62.  We concluded nevertheless that, in light of the evidence adduced at trial, including the defendant's inculpatory statements, the prosecutor's comments did not deprive defendant of a fair trial.  Id. at 63-64.  We also stated that, while prosecutors are permitted to convincingly summarize the State's case, the summation must be limited to the evidence presented "and the reasonable inferences to be drawn therefrom."  Id. at 58-59 (quoting State v. Johnson, 120 N.J. 263, 296 (1990)).

We reached a different conclusion in Frost, where the jury convicted the defendant of various drug offenses emanating from his sale of illegal narcotics to an undercover police officer.  158 N.J. at 78-83.  We reversed the defendant's conviction, finding the prosecutor's summation before the jury constituted prejudicial prosecutorial misconduct.  Id. at 89.

During the trial in <u>Frost</u>, officers testified in detail about a drug transaction in which the defendant purportedly participated. <u>See id.</u> at 79-80. In the defendant's vastly different version of the facts, he claimed to be an innocent bystander who happened to be visiting his cousin when police "kick[ed] in the apartment door." <u>Id.</u> at 80. Since the outcome of the trial depended on credibility, defense counsel sought to undermine a testifying police officer's trustworthiness by pointing out that the State failed to produce the "buy money" itself or a copy. <u>Ibid.</u> In response, the prosecutor closed to the jury by making a clear misstatement of the law -- that "buy money" was inadmissible. <u>Id.</u> at 81, 85. The prosecutor also improperly vouched for the police officer's credibility by suggesting "that police officers would not lie because of the 'magnitude' of charges that could be brought against them," <u>id.</u> at 85, and disparaged defense counsel by calling his closing arguments "lawyer talk," <u>id.</u> at 81. During the prosecutor's closing, defense counsel objected to each of those references by the prosecutor and, although some of counsel's objections were sustained, the trial court did not strike any of the comments or provide a curative instruction. <u>Ibid.</u>

The Appellate Division affirmed the defendant's conviction, finding that, although "the prosecutor struck several foul blows," the comments did not constitute prejudicial error. <u>Id.</u> at 82. We reversed, noting that the trial judge did not take any curative action regarding the prosecutor's "inaccurate" and

18

"misleading" comments. Id. at 85. Furthermore, despite the Appellate Division's conclusion that "overwhelming" evidence pointed to the defendant's guilt, "the State's entire case rested on the testimony of the officers" and "whether the jurors believed the officers' testimony or defendant['s]." Id. at 87. Thus, because the case turned on credibility, the quantum of evidence did not overcome the defendant's "entitlement to a constitutionally guaranteed right to a fair trial." Ibid. We emphasized once again in Frost that prosecutors "should confine their summations to a review of, and an argument on, the evidence, and not indulge in improper expressions of personal or official opinion as to the guilt of the defendant, or [otherwise engage] in collateral improprieties of any type, lest they imperil otherwise sound convictions." Id. at 88 (alteration in original) (quoting State v. Thornton, 38 N.J. 380, 400 (1962)).

In Jackson, we again cautioned prosecutors against straying beyond the evidence adduced at trial but did not find reversible error. 211 N.J. at 412-13. The defendant in Jackson was arrested for robbing a taxi driver at a stop light. Id. at 398. Although the defendant was patted down at the time of his arrest, a subsequent search at the police station revealed a gun, leading to an altercation between officers and the defendant. Id. at 399. Later, one of the officers drafted a false report, omitting the failure to find the gun during the initial search. Ibid.

19

During trial in <u>Jackson</u>, the State presented testimony from three different police officers that touched upon matters extraneous to the criminal charges against the defendant -- the defendant's altercation with police, an assault charge filed against one of the officers, administrative discipline imposed on the officer who drafted the false report, and the defendant's civil lawsuit against the department. <u>Id.</u> at 410-11. At one point, defense counsel objected as to relevancy but withdrew the objection. <u>Id.</u> at 410. The prosecutor commented on those extraneous matters before concluding his summation by stating that the officer "chose to lie in his report. And now [the defendant] wants to be a millionaire," referring to his civil lawsuit. <u>Id.</u> at 411. Defense counsel moved for a mistrial or, in the alternative, for a curative instruction. <u>Ibid.</u> The trial court denied the motion for a mistrial but did provide a curative instruction. <u>Id.</u> at 411-12.

Importantly, defense counsel in <u>Jackson</u> did not object to the testimony proffered by the State, and the testimony was admitted as evidence. <u>Id.</u> at 412-13. As to the prosecutor's improper comments during closing, the trial judge gave a timely curative jury instruction that its verdict must be independent of any related but extraneous matters. <u>Ibid.</u> Although we noted that unnecessary comments during summation may cause jury confusion, we concluded that reversible error had not occurred because the prosecutor's statements were "fully grounded in evidence" that was admitted without objection from defense counsel. <u>Id.</u> at 412-

20

13. Despite concluding in Jackson that no reversible error occurred, we nonetheless reemphasized that prosecutorial misconduct warranting reversal of a defendant's conviction can be based upon references to matters extraneous to the evidence. Ibid.

Most recently, we reached a similar conclusion in McNeil-Thomas -- a case involving the fatal shooting of an off-duty police officer who was not the intended target. 238 N.J. at 261, 264. The officer was picking up dinner at a local restaurant where a group of young women who had fought with the defendant and his family about an hour earlier were eating. Id. at 261-62, 264. In closing, the prosecutor used a five-second clip from a video surveillance camera and suggested to the jury that the defendant, while following his stepfather's pickup truck in a black Cadillac CTS, drove by the restaurant where the shooting later occurred to be sure that his intended targets were there. Id. at 270.

We first determined that the video clip had been offered and admitted into evidence and then addressed whether it was proper for the prosecutor to suggest during summation that the five-second clip showed the defendant's stepfather driving by the restaurant, followed by the defendant riding in a black Cadillac CTS. Id. at 260-61, 272-74. This Court concluded that the prosecutor's statements were "fair comment on the evidence" and thus did not result in reversible error. Id. at 280-81. We observed that the prosecutor presented the jury with the opportunity

to draw reasonable inferences from and connections between the testimony of the defendant's neighbor, who referred to the vehicle in which the defendant returned home before the shooting as a "black sedan . . . 'like' a Cadillac CTS," id. at 264, and the police photographs and video depicting the pickup truck and the black sedan, all of which were admitted into evidence and were part of the record, id. at 280-81. Thus, we concluded the prosecutor's comments during summation "were reasonable and fair inferences supported by the evidence presented at trial," reversed the Appellate Division's judgment, and reinstated the defendant's conviction. Id. at 261.

Feaster, Frost, Jackson, and McNeil-Thomas make clear that, in closing, prosecutors are obliged to confine their comments to the evidence admitted at trial and reasonable inferences drawn therefrom. Failing to do so may imply that facts or circumstances exist beyond what has been presented to the jury and encroach upon a defendant's right to a fair trial.

With those principles in mind, we now address whether the prosecutor here, where the central issue at defendant's trial was whether he committed a robbery or a theft, improperly invited a comparison between defendant and Jack Nicholson's psychotic, ax-wielding character in The Shining.

22

IV.

A.

As noted, in order to convict defendant of second-degree robbery under N.J.S.A. 2C:15-1, the jury must find that while committing a theft, defendant used force, threatened the use of force, or purposely put the bank teller in fear of immediate bodily injury. To establish theft, on the other hand, the State need establish only that defendant exercised unlawful control over the movable property of another -- the bank's money. N.J.S.A. 2C:20-3.

To prove defendant robbed the Merchantville bank, the prosecutor presented Cervantes, who testified that she felt threatened because she "didn't know what [defendant] could have in his pockets." Similarly, Cowgill, testified that when Cervantes tried to include the GPS tracker, defendant leaned toward Cervantes and said forcefully: "No, you're leaving that there. Don't touch that." Cowgill also stated that Cervantes began crying when defendant left and was shaking during and after the incident.

During summation, to convey the supposed threatening nature of defendant's note, conduct, and words, the prosecutor displayed a still shot from <u>The Shining</u> with the innocuous words, "Here's Johnny!" While showing the extra-evidentiary photograph to the jury, the prosecutor stated "that [i]t's not just the words; it's what you do before and what you do after the words

23

that matters," suggesting "that's what makes this a robbery."  The prosecutor also told jurors who may have seen the movie, "you know how his face gets through that door" -- a reference to the movie scene preceding the image where Jack Nicholson smashes through the door with an ax while trying to get to and kill his family.

Unlike in McNeil-Thomas and Jackson, in which the prosecutor "invited" jurors to draw inferences about matters in evidence -- a video in McNeil-Thomas and testimony in Jackson, the prosecutor in this case -- where defendant's prosecution for robbery hinged on whether defendant purposely placed Cervantes in fear of immediate bodily injury -- asked jurors to draw an inference reinforced by a disturbing photograph not in evidence.  The prosecutor's references to the violent and frightening movie scene and use of an inflammatory photograph with the words "Here's Johnny!" "[were] not reasonably related to the scope of the evidence presented" or "the legitimate inferences therefrom," McNeil-Thomas, 238 N.J. at 275 (quotations omitted). Unlike in the movie scene -- where Jack Nicholson uses an ax to break through a locked door before saying the words "Here's Johnny!" --  no act of physical violence preceded defendant handing to Cervantes the note that read "Please, all the money, 100, 50, 20, 10, Thank you." or followed her handing the money to defendant.  The prosecutor here nevertheless asked the jury to infer from the

24

photograph and the words "Here's Johnny!" that defendant's words and "actions" purposefully put Cervantes in fear of immediate bodily injury.

Our jurisprudence requires "that prosecutors act in accordance with certain fundamental principles of fairness." Wakefield, 190 N.J. at 436. As we explained in Feaster, comments by a prosecutor in closing that stray beyond the evidence and the reasonable inferences therefrom are inappropriate and improper. 156 N.J. at 59. And in Frost, we reversed the defendant's conviction, concluding that the prosecutor's statements were "inaccurate" and "misleading." 158 N.J. 85. The prosecutor here, in an attempt to establish that Cervantes feared for her wellbeing because of defendant's conduct, went far beyond the evidence at trial to draw a parallel between defendant's conduct and that of a horror-movie villain.

Amicus Attorney General suggests defendant is not entitled to relief because he never moved for a mistrial based on the prosecutor's use of the PowerPoint slide and declined a curative instruction. Those are indeed factors to be considered in deciding whether a defendant's conviction should be reversed for prosecutorial misconduct. Frost, 158 N.J. at 83-84. We note, however, that defense counsel did offer a timely objection to the use of the photograph, and the trial court suggested that a curative instruction might highlight the photograph and the remarks by the prosecutor. Also, the

25

prosecutor's comments were neither withdrawn nor stricken from the record. We conclude that application of the Frost factors here does not undermine defendant's claims.

We agree with defense counsel that whether defendant purposely put Cervantes in fear of immediate bodily injury -- thus supporting a conviction for robbery, not theft -- was a "close call." Weighing "the severity of the misconduct and its prejudicial effect on the defendant's right to a fair trial," Wakefield, 190 N.J. at 437, we determine the prosecutor's comments and the extra-evidentiary movie photograph "made it more likely that the jury would reject the defense" that only a theft occurred. Thus, the prosecutor's conduct during summation was "clearly capable of having an unfair impact on the jury's deliberations," intruded upon defendant's right to a fair trial, and constituted reversible error.

### B.

We acknowledge defendant's suggestion that, to avoid the risk of similar errors in the future, the Court could adopt a rule requiring prosecutors to provide opposing counsel with any planned PowerPoint presentations before openings and summations.

To avoid objection or possible error, we encourage counsel to disclose to each other and the court any visual aids intended to be used during closing

26

argument, but we do not require that practice.  As we explained in <u>McNeil-Thomas</u>, "the State is under no duty to announce to the defense each inference it will ask the jury to reach during summation."  238 N.J. at 279.

Nevertheless, "we remind prosecutors that they have a 'unique role and responsibility in the administration of criminal justice,'" <u>Frost</u>, 158 N.J. at 89 (quoting <u>In re Rachmiel</u>, 90 N.J. 646, 656 (1982)), and therefore must ensure their strategy and commentary fall within "the boundaries of permissibly forceful advocacy," <u>Marshall</u>, 123 N.J. at 161.  Prosecutors must walk a fine line when making comparisons, whether implicit or explicit, between a defendant and an individual whom the jury associates with violence or guilt. The use of a sensational and provocative image in service of such a comparison, even when purportedly metaphorical, heightens the risk of an improper prejudicial effect on the jury.  Such a risk was borne out here.

Visual aids such as PowerPoint presentations must adhere to the same standards as counsels' spoken words.  In that regard, we agree with guidance the Delaware Supreme Court provided in <u>Spence v. State</u>:

> This Court does not seek to discourage the use of technology in closing arguments to summarize and highlight relevant evidence for the benefit of the jury. But slides may not be used to put forward impermissible evidence or make improper arguments before the jury.  A PowerPoint may not be used to make an argument visually that could not be made orally. While prosecutors are given latitude in making closing

27

arguments, [their] comments must be limited to properly admitted evidence and any reasonable inferences or conclusions that can be drawn therefrom.

[129 A.3d 212, 223 (Del. 2015).]

The PowerPoint here fell short of that standard.

## V.

For the reasons set forth above, we reverse the judgment of the Appellate Division, vacate defendant's conviction, and remand for a new trial.

CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, ALBIN, PATTERSON, FERNANDEZ-VINA, and PIERRE-LOUIS join in JUSTICE SOLOMON'S opinion.