**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1427-23

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

JONATHAN G. NISBETT, a/k/a
NISBELL, JONAHAN NISBETT,
JOHNATHAN G. NISBETT,
JONATHAN G. NISBITT, and
JOHNATHAN G.,

     Defendant-Appellant.

_____

Submitted February 24, 2026 – Decided May 12, 2026

Before Judges Sumners and Susswein.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Indictment No. 19-11-3199.

Jennifer N. Sellitti, Public Defender, attorney for appellant (Zachary G. Markarian, Assistant Deputy Public Defender, of counsel and on the brief).

Theodore N. Stephens II, Essex County Prosecutor, attorney for respondent (Frank J. Ducoat, Deputy Chief Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant Jonathan Nisbett appeals his jury trial convictions for kidnapping, robbery, and other charges stemming from an August 2019 crime spree in which he broke into two units in an Irvington apartment building. Defendant challenges his jury trial convictions, arguing that two comments by the prosecutor in summation were improper, depriving him of his right to a fair trial. After reviewing the record in light of the governing legal principles, we affirm the convictions.

Defendant also contends the trial court erred by sentencing him to twenty years as if he had been convicted of first-degree kidnapping, whereas the jury charge only included the elements of second-degree kidnapping and omitted the "failure to release unharmed" element required for a first-degree kidnapping conviction. The State concedes this sentencing error. We therefore remand for resentencing for second-degree kidnapping and to amend the judgment of conviction.

I.

We discern the following pertinent facts and procedural history from the record. On the evening of August 19, 2019, the first victim, M.E.,[1] was sitting on the porch outside her Irvington apartment building when defendant approached her and asked if she knew the person who lived in Apartment 3B. M.E. replied that she did not, and defendant walked away.

Around 10:00 p.m. that night, M.E. returned to her residence in Apartment 4B, unlocked her door, and saw that her shoes and clothes were scattered throughout the apartment. When she entered she saw defendant standing by her refrigerator. Defendant asked her where she kept her money and pointed two guns at her face, telling her to get on her knees and threatening to shoot her. Defendant grabbed M.E.'s car and apartment keys, phone, and tablet from her hands. M.E. went to her bedroom to check her purse but saw that defendant had already taken all of her cash. Defendant then took M.E.'s credit card, driver's license, debit card, and gift cards from her wallet. Defendant asked M.E. where her car was parked and she told him it was parked on the street, even though it was in fact parked behind the apartment building.

---

[1] We use initials to protect the confidentiality of the victims in these proceedings. See R. 1:38-3(c).

Defendant then led M.E. to the bathroom, told her to lay down, and tied her hands and legs behind her back using duct tape and rope. After defendant exited her apartment, M.E. heard noises from the apartment downstairs. When the noises stopped, she managed to remove her bonds, went to her neighbor's house, and called the police.

Also around 10:00 p.m. that night, J.D., who lived in the same apartment building, heard a noise that sounded like a window breaking. He went outside and saw a broken window on the third floor. He went inside to investigate and saw that the door to Apartment 3B was open, the apartment was a mess, and the windows were broken. From a window in the second-floor stairwell, J.D. saw a man on the street in front of the building, looking into the windows of several cars—including J.D.'s vehicle—and trying to open the doors. J.D. used his cell phone to take a picture of the man and then called the police.

The second burglary victim, D.H., was on vacation in Miami at the time of the break-in. That evening, she received a call from the building superintendent regarding the incident, and she asked her father, K.H., to check on her apartment. K.H. went to her unit and saw that the door was off its hinges, the window by the fire escape was broken, and there was blood on the floor. K.H. came upon J.D.,

A-1427-23

who texted him the photograph of the man who was trying to open car doors. K.H. forwarded the photo to D.H.

D.H. recognized the man in the picture as defendant, whom she had known for the past ten years, as he is the cousin of D.H.'s son's father, J.M. D.H. had most recently seen defendant the previous month, when he appeared on the fire escape outside her apartment and began to open the window from the outside. D.H. asked defendant why he was on her fire escape—and why he hadn't called ahead or knocked on the door—and he replied that he was looking for J.M. D.H. threatened to call the police, and defendant retreated by climbing back down the fire escape.

D.H. also testified that, sometime after the incident, defendant called J.M.'s phone, and she picked up and spoke to defendant. She asked defendant why he broke into her apartment, and he "laughed about it" and stated that he did not remember, adding that whatever was damaged, J.M. could replace.

As part of the police investigation, Irvington Police Department Sergeant Albern Mondelus collected a bloody pillow and soiled t-shirt from Apartment 3B, along with a swab of blood from the window area and a swab of blood from the floor near the window. In Apartment 4B, Sergeant Mondelus collected duct tape and the jump rope used to tie up M.E.

Forensic scientist Amanda Battaglia analyzed the swab from the window area. A comparison with a buccal swab taken from defendant indicated a DNA profile match. Analysis also indicated that the swab from the window area contained blood, although Battaglia acknowledged that the DNA profile could have theoretically come from skin cells in the swab, if any, rather than blood cells. Battaglia also noted that it was not "impossible" that skin cells left undisturbed could remain on a surface for a month or more. The pillow, t-shirt, and swab from the floor were not tested due to a laboratory policy. A sample taken from the jump rope was not of sufficient quality or quantity for DNA comparison.

The day after she was tied up and robbed, M.E. identified defendant's picture in a photo array, stating that he "looks familiar" and "that's the face I remember."

In November 2019, defendant was charged by indictment with first-degree robbery, N.J.S.A. 2C:15-1 (count one); first-degree kidnapping, N.J.S.A. 2C:13-1(a) (count two); third-degree criminal restraint, N.J.S.A. 2C:13-2(a) (count three); third-degree terroristic threats, N.J.S.A. 2C:12-3(b) (count four); two counts of second-degree burglary, N.J.S.A. 2C:18-2 (counts five and six); second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b) (count

6

seven); second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a) (count eight); third-degree fraudulent use of a credit card, N.J.S.A. 2C:21-6(h) (count nine); and fourth-degree credit card theft, N.J.S.A. 2C:21-6(c)(1) (count ten).

Defendant moved to dismiss the indictment, and the court held a hearing on the motion on January 7, 2022. The court denied the motion but—with the State's consent—amended the first-degree kidnapping count of the indictment (count two) to second-degree kidnapping.

Defendant was tried before a jury over the course of several days in May 2023. The jury convicted defendant of kidnapping (count two), criminal restraint (count three), terroristic threats (count four), second-degree burglary (count five), third-degree burglary (count six), and credit card theft (count ten). The jury also convicted defendant of robbery (count one) but could not reach a verdict as to whether he was armed with a deadly weapon, as would be required to elevate the conviction to first-degree robbery.

The jury acquitted defendant of unlawful possession of a weapon (count seven), possession of a weapon for an unlawful purpose (count eight), and fraudulent use of a credit card (count nine).

Defendant was sentenced on December 4, 2023. Even though the jury charge only included the elements of second-degree kidnapping, the court sentenced defendant to twenty years for "first degree kidnapping" (count two), which it merged with the criminal restraint count (count three). The court merged counts four (terroristic threats) and ten (credit card theft) into count one (robbery) and sentenced defendant to seven years. On count five (second-degree burglary), the court sentenced defendant to seven years. On count six (third-degree burglary), the court sentence defendant to five years. The court ran all sentences concurrently. In sum, defendant received an aggregate term of twenty years, subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2.

This appeal follows. Defendant raises the following contentions for our consideration:

> POINT I
> BECAUSE [DEFENDANT] WAS INDICTED, TRIED, AND CONVICTED OF SECOND-DEGREE KIDNAPPING, HIS 20-YEAR SENTENCE IS ILLEGAL, AND HIS CONVICTION AND SENTENCE MUST BE AMENDED TO REFLECT THE SECOND-DEGREE OFFENSE.
>
> POINT II
> [DEFENDANT] WAS DEPRIVED OF A FAIR TRIAL BY THE STATE'S PERVASIVE MISSTATEMENTS OF CRITICAL TRIAL EVIDENCE IN SUMMATION.

A-1427-23

II.

We first address defendant's contention that the prosecutor made two improper comments during her summation, the cumulative effect of which was to deprive defendant a fair trial, thus requiring reversal of all convictions. We begin our analysis by acknowledging the legal principles governing this appeal.

"'[P]rosecutors in criminal cases are expected to make vigorous and forceful closing arguments to juries' and are 'afforded considerable leeway'" in doing so. State v. Williams, 244 N.J. 592, 607 (2021) (quoting State v. Frost, 158 N.J. 76, 82 (1999)). However, they "must confine their comments to evidence revealed during the trial and reasonable inferences to be drawn from that evidence." State v. Smith, 167 N.J. 158, 178 (2001). "Ultimately it [is] for the jury to decide whether to draw the inferences the prosecutor urged." State v. McNeil-Thomas, 238 N.J. 256, 275 (2019) (alteration in original) (quoting State v. Carter, 91 N.J. 86, 125 (1982)).

"[E]ven when a prosecutor's remarks stray over the line of permissible commentary, our inquiry does not end." Williams, 244 N.J. at 608 (quoting McNeil-Thomas, 238 N.J. at 275). Instead, we must determine "the severity of the misconduct and its prejudicial effect on the defendant's right to a fair trial." Ibid. (quoting State v. Wakefield, 190 N.J. 397, 437 (2007)). Stated another

9                                                        A-1427-23

way, an appellate court may reverse a conviction only if "the conduct was so egregious as to deprive defendant of a fair trial." Ibid. (quoting Wakefield, 190 N.J. at 437). In making that determination, "an appellate court must take into account the tenor of the trial and the degree of responsiveness of both counsel and the court to improprieties when they occurred." Ibid. (quoting Frost, 158 N.J. at 83). "Generally, if no objection was made to the improper remarks, the remarks will not be deemed prejudicial," as "[t]he failure to object suggests that defense counsel did not believe the remarks were prejudicial at the time they were made" and "deprives the court of an opportunity to take curative action." Frost, 158 N.J. at 83-84.

A.

Prosecutor's Summation Comment Concerning Untested DNA Evidence

Defendant contends the prosecutor erred by remarking in summation that, if the police had been able to conduct DNA testing of additional blood-stained items in the apartment, that "would just prove more to the defendant's guilt." Defendant argues for the first time on appeal that the prosecutor improperly shifted the State's burden of proof by suggesting the jury should assume that any untested evidence would have further proven defendant guilty. Defendant also

contends the remark implied that the prosecutor had additional proof of his guilt beyond the evidence presented at trial.

To put the prosecutor's remark in context, we must consider the defense theory as explained by defense counsel in her own summation. A major defense theme was that the police investigation was "flawed" and inadequate. Specifically, defense counsel argued in summation that the officers "didn't have the materials that they needed," including a fingerprint kit or evidence placards; that Sergeant Mondelus didn't properly document where blood swabs were taken from; and that "a whole host of items" recovered from the scene were not tested, including a blood-soaked shirt and pillow. Defense counsel also argued that the positive DNA test from the window area could have been based on skin cells defendant left behind when he attempted to open the window from the fire escape a month before the break-in.

In response to the defense summation, the prosecutor offered the following remarks in her own summation:

> . . . Now you don't have to agree with how Irvington Police Department conducted the investigation, that some things were missed. The State agrees with you there. However, if Irvington did a complete investigation where they had those fingerprint kits, one, they wouldn't be able to get anything there but say they were able to do more here. They were able to test every item. There were resources to be able to do all of these

things.  <u>It would just prove more to the defendant's guilt.</u>

[(Emphasis added).]

Defendant did not object to this comment.

The State on appeal argues the prosecutor was simply proposing an inference that, because one blood swab came back as a positive match for defendant, testing additional blood found in the apartment—including the blood-soaked shirt and pillow—would have produced a similar match.  We agree that as a general proposition, a prosecutor is permitted to "respond to an issue or argument raised by defense counsel."  <u>State v. Johnson</u>, 287 N.J. Super. 247, 266 (App. Div.), <u>certif. denied</u>, 144 N.J. 587 (1996).  We are also satisfied that when viewed in context, the prosecutor's fleeting remark was fair comment on the evidence that the jury was free to accept or reject.

We note the prosecutor amplified the State's responsive argument that defendant is now challenging, providing additional detail by stating:

> Now the most important thing Sergeant Mondelus told us is about that blood that he photographed, that he swabbed.  That was fresh, wet blood.  That wasn't blood that was sitting there for three to four weeks.  He told you it was fresh, wet, he used the word, droppings of blood.  That he was able to roll those Q tips in that blood to collect the blood.

12

Now defense wants you to believe that they actually took skin cells and that's how they tested and got his DNA, but if we listen to what we actually heard from Miss Battaglia, she said the blood stain was one person. I'm telling you this was a blood stain, not skin cell[s] because this was fresh, wet blood.

Every officer that took the stand told you they saw a blood trail. . . .

. . . Sergeant Mondelus told you that he took a blood sample from the window, where the blood started, where the shattered window was, and that blood came back to [defendant] independent of any other evidence here.

Viewed in context, we are satisfied that the prosecutor's argument that additional testing would have further proven defendant's guilt, while unartfully phrased, was not mere speculation. The positive DNA test from "fresh blood" on the window and testimony that there was a "blood trail" supported a legitimate inference that other blood in the apartment also came from defendant. The prosecutor was entitled to urge the jury to accept this inference, especially in response to defense counsel's argument that the investigation was shoddy and inadequate.

Importantly, moreover, the prosecutor in summation explicitly stated that her burden was to prove defendant's guilt beyond a reasonable doubt. The prosecutor's explicit acknowledgment of that burden undercuts defendant's

13

newly minted argument that the prosecutor's comment shifted the burden of proof. Additionally, the trial court emphasized the burden of proof on multiple occasions throughout the jury instructions. The court also instructed the jury that counsels' remarks in summation "are not evidence and must not be treated as evidence."

We add that even were we to assume for the sake of argument that the prosecutor's remark was improper, it would not warrant reversal. Because defendant made no objection to this remark, we review it for plain error. R. 2:10-2. We reiterate and stress that when "no objection was made to the improper remarks, the remarks will not be deemed prejudicial," as "[t]he failure to object suggests that defense counsel did not believe the remarks were prejudicial at the time they were made." Frost, 158 N.J. at 83-84.

In sum, the prosecutor's comment was one sentence in a thirty-page summation, she promptly substantiated it with a more detailed argument grounded in officer testimony, defense counsel never objected to the remark, and the jury received clear instruction that counsel's remarks in summation are not evidence and that the State must prove its case beyond a reasonable doubt. In these circumstances, even if we deemed the remark to be improper, it was not

"so egregious as to deprive defendant of a fair trial." <u>Williams</u>, 244 N.J. at 608 (quoting <u>Wakefield</u>, 190 N.J. at 437).

B.

<u>Prosecutor's Summation Comment that D.H. "Zoomed In" on a Photograph</u>

We turn next to defendant's contention that the prosecutor mischaracterized D.H.'s testimony, improperly bolstering her identification of defendant. Specifically, the prosecutor in summation mistakenly asserted that D.H. testified that she used her phone to zoom in on the picture of defendant that enabled her to identify him.

To address this contention, it is necessary to provide background information. Before D.H. testified, the trial court held a N.J.R.E. 104 hearing regarding, in part, the reliability of her identification of defendant in the picture she received by text message the night of the incident. At this in limine hearing, defense counsel asked D.H. how she knew that the photograph sent to her by text depicted defendant. D.H. stated "[bec]ause the picture is printed out but when you view it on the phone, [I've] been around [defendant] a long period of time so I know what [defendant] looks like." In front of the jury, however, D.H. merely stated that on the night of the incident, her father texted her a picture of a person squatting by a car, whom she recognized as defendant.

A-1427-23

In her closing argument, defense counsel sought to undermine D.H.'s identification of defendant, arguing that the picture was blurry and did not clearly show the person's face:

> But look at this photo. You can't see the man's face. You've been in the same courtroom with [defendant] the whole time. You can't identify him. You can barely see a portion of his face. It's dark, it's blurry. I don't care if [D.H. is] his cousin, [his] identical twin. You can't identify the person in that photo. But [D.H.] said it could be [defendant]. And everything's spiraled from there.

In response, the prosecutor argued in her summation that D.H.'s identification was reliable, highlighting the fact that D.H. viewed the picture on her phone, rather than the printed version. However, the prosecutor seemingly referred to testimony by D.H. at the 104 hearing that the jury did not hear. The prosecutor also incorrectly argued to the jury that D.H. testified that she "zoomed in" on the picture, stating:

> Now there's one thing that [D.H.] said on cross-examination when defense was asking her questions about how she was able to tell based on this photograph, she made it a point, her phone. She didn't get this photo printed out. She got this photograph on her phone. <u>She said she zoomed in.</u>
>
> <u>Ladies and gentlemen, the quality when she would have zoomed in on her phone compared to a printed photo is much different and she told you that. She told you she could clearly see on her phone.</u> She

16

immediately identified this defendant, someone she knew for over 10 years, technically family.

[(Emphasis added).]

After the prosecutor concluded her summation and the jury was excused, defense counsel objected, arguing that the prosecutor made improper reference to testimony that was not part of the trial record, as D.H. never testified that she zoomed in on the picture on her phone. Defense counsel asked the court to strike the inaccurate comments and instruct the jury that they should disregard them. The court denied the request, noting that the objection was not made at the time of the comments and that the comments were not "so egregious that it would be unduly prejudicial."

On appeal, defendant contends that the court's failure to strike the remarks and issue a curative instruction warrants reversal of his convictions. Specifically, defendant argues that the prosecutor's claim that D.H. zoomed in on the picture to see it more clearly on her phone was not supported by the trial record and exceeded any "reasonable inferences to be drawn from [the] evidence." Smith, 167 N.J. at 178. Defendant further contends this remark had a significant effect on his right to a fair trial. He argues that D.H.'s identification was critical evidence that "would have been significantly undermined if the jury concluded the photo was too blurry to allow her to make a meaningful

identification." Defendant also argues the remainder of the State's case was weak, as M.E.'s identification of defendant was somewhat tentative, the DNA on the window area could have been left when defendant climbed the fire escape weeks prior to the robbery, and the State introduced no surveillance video and no evidence linking the proceeds of the robberies or any weapon to defendant.

The State acknowledges that the prosecutor "obviously should not have said" that D.H. stated she zoomed in on the picture, but argues that the prosecutor's broader argument that D.H. could see the photo better on her phone than in the printed version was a fair inference from the evidence.

We agree with defendant that the prosecutor's comments exceeded a reasonable inference from the evidence. Specifically, her statements that "[D.H.] said she zoomed in" and "[s]he told you she could clearly see on her phone" were not accurate. Accordingly, when this was brought to the trial court's attention, the court should have issued a curative instruction. We do not agree with the trial court that by not objecting during the prosecutor's summation, defendant essentially waived the right to a curative instruction.

That said, we are satisfied that when viewed in context, the prosecutor's inaccurate description of D.H.'s testimony did not "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." McNeil-

18

Thomas, 238 N.J. at 276 (alteration in original) (quoting State v. Jackson, 211 N.J. 394, 409 (2012)). The jury saw D.H. identify defendant in the picture without hesitation on multiple occasions: besides initially identifying defendant in the picture on her phone, D.H. identified him again when the detective showed her the printed photo shortly after the incident,[2] and also identified him in the printed photo at trial, in front of the jury.

Furthermore, the jury was instructed that summations of counsel must not be treated as evidence, and that its own recollection of the evidence controls. Finally, M.E.'s identification, the positive DNA test, and defendant's inculpatory statements on the phone with D.H. after the incident all pointed to his guilt and were independent of D.H.'s texted-photo identification. In these circumstances, the prosecutor's misstatement in summation was not "so egregious as to deprive defendant of a fair trial." Williams, 244 N.J. at 608 (quoting Wakefield, 190 N.J. at 437).

III.

Defendant also contends that the two alleged summation errors cumulatively prejudiced his right to a fair trial. Our Supreme Court has "recognized . . . that even when an individual error or series of errors does not

---

[2] A video recording of this identification was played for the jury at trial.

19

rise to reversible error, when considered in combination, their cumulative effect can cast sufficient doubt on a verdict to require reversal." State v. Jenewicz, 193 N.J. 440, 473 (2008). However, "[i]f a defendant alleges multiple trial errors, the theory of cumulative error will still not apply where no error was prejudicial and the trial was fair." State v. Weaver, 219 N.J. 131, 155 (2014). The law is well settled in this regard that "devised and administered by imperfect humans, no trial can ever be entirely free of even the smallest defect. Our goal, nonetheless, must always be fairness. 'A defendant is entitled to a fair trial but not a perfect one.'" State v. R.B., 183 N.J. 308, 333-34 (2005) (quoting Lutwak v. United States, 344 U.S. 604, 619 (1953)).

Considering our analysis of the two statements the prosecutor made in her summation, we are satisfied that defendant's cumulative error argument lacks merit. The prosecutor's statements simply do not "cast sufficient doubt on [the] verdict to require reversal." Jenewicz, 193 N.J. at 473.

To the extent we have not addressed them, any remaining arguments raised by defendant with respect to his trial convictions lack sufficient merit to warrant discussion. R. 2:11-3(e)(2).

## IV.

We need only briefly address defendant's contention that he was improperly sentenced as if he had been convicted of first-degree kidnapping when in fact the jury found him guilty of second-degree kidnapping. The State concedes that a remand is needed to correct the judgment of conviction and to re-sentence the defendant within the second-degree range applicable to the kidnapping offense for which he was convicted. We therefore remand for resentencing for second-degree kidnapping and to amend the judgment of conviction.

Affirmed in part and reversed and remanded in part. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Hanley*

Clerk of the Appellate Division